(79 South. 768)

No. 20757.

HARANG et al. v. GOLDEN RANCH LAND & DRAINAGE CO.

(Jan. 28, 1918. · On Rehearing, June 29, 1918.)

*(Syllabus by the Court.)*

1. PRESCRIPTION—LIBERANDI CAUSA—POSSESSION—ASSERTION OF OWNERSHIP.

From the moment that the rights of the owner not in possession of immovable property are challenged or invaded by one who sets up an adverse claim of title or possession, the relation of debtor and creditor, within the meaning of the law declaring the prescription liberandi causa is established, and, if the pretensions of the debtor are of a character to authorize or require an action at law, on the part of the owner, who becomes the creditor, for the vindication of such rights, the period at the end of which that prescription becomes effective begins, and, if the creditor remains silent until its completion, he loses, not only his right to complain that the title asserted by the debtor is defective, or no title, or his possession not such as to enable him to hold the property as owner, but the right to bring any action at all, since the prescription operates as a peremptory and perpetual bar to every species of action, real or personal, that he might otherwise have brought in the premises.

O'Niell and Provosty, JJ., dissenting.

On Rehearing.

*(Additional Syllabus by Editorial Staff.)*

2. ADVERSE POSSESSION ☞40—PRESCRIPTION—DURATION OF POSSESSION.

Under prescription liberandi causa, Civ. Code, art. 3548, construed with article 3457 and articles 3499 et seq. and 496, an owner, not manifesting his ownership within 30 years, does not lose his ownership or his right of action to recover the property from one who within 30 years has taken possession of it; but adverse possession during 30 years is necessary for de-

priving an owner of his right to assert his title judicially.

Monroe, C. J., dissenting.

Appeal from Twentieth Judicial District Court, Parish of Lafourche; Charles T. Wortham, Judge.

Petitory action by Dominique Harang and others against the Golden Ranch Land & Drainage Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Alexis Brian, of New Orleans, for appellant. D. V. Doussan and Charles T. Starkey, both of New Orleans, for appellees.

## Statement of the Case.

MONROE, C. J. The plaintiff whose name appears in the title and his sister Mrs. (widow) Meunier, prosecuting this petitory action as two of the children and heirs of Louis Harang, obtained judgment decreeing them to be the owners each of an undivided $2280/25920$ interest in an undivided one-third of a tract of land containing 2,314 acres, which, for the purposes of this opinion, is sufficiently designated by the shaded area upon the subjoined "sketch." The claim, as set up in the petition, includes also the tract bounded by the 80 and 40 arpent lines, the Bayou Coquille, and the line "N 9 W," as those boundaries appear on the sketch, but as to that tract was not insisted on, since the present defendant is not asserting title thereto, and, as we understand plaintiffs have brought a suit for its recovery against one other person, who is said to be in possession. Defendant sets up title, through mesne conveyances, under a notarial act of April 8, 1880, from Oscar Lepine, who is alleged to have acquired the larger tract in which the land in dispute is included at a tax sale in December, 1873, followed by an auditor's deed in 1874, and conveyances from the tax debtors in 1875, which tax sale was confirmed, at the instance of defendant or its author in title,

by judgment of the district court for the parish or Lafourche in September, 1910; and it (defendant) pleads the prescriptions of 3, 10, 13, and 30 years, res judicata and estoppel. The trial judge held that the title relied on by defendant included no land to the westward of the line "N 9 W," as indicated on the sketch, and gave judgment for plaintiffs, from which defendant has appealed. The land represented on the sketch down to the 40-arpent line appears to have been included in a grant made by the French government to Joseph Villars Dubreuil on June 1, 1763; and all the land embraced in that grant was sold in the succession of Dubreuil to his son-in-law, Charles Jean Baptiste Florian, on March 12, 1772, and the grant was confirmed to him in 1806 by decision No. 213' of the commissioners of the bureau of lands of the district of Louisiana, according to which it was supposed to embrace 45.9861½ arpents though, according to a survey made by A. F. Rightor, deputy surveyor, in October 1839, and approved by the surveyor general of this state on December 14, 1839, it embraced 121.029 acres. Florian (or Fleuriau, as the name most frequently appears in this record) and his wife left two daughters, one of whom, Marie Melanie, married Louis Charbonnet, and the other, Jeanne Marie, became the wife of Joseph Enoul Dugué Livaudais. Mrs. Livaudais died, and, on August 29, 1912, a partition was effected between her three sons (Philippe, Joseph, and Charles) and her daughter, Marie Jeanne, who shortly afterward married Louis Harang, and Mrs. Charbonnet, their aunt, whereby the Livaudais heirs acquired all the land lying to the north of Bayou Vacherie, then, also, called Bayou Cheti Tamaha, and Mrs. Charbonnet acquired all lying to the south of that bayou. The litigants, instead of producing ordinarily certified copies of the act of partition, have filed in evidence copies made by some photographic process, and referred to as "pho-

SKETCH.

tostats," which appear to us to be rather poorly executed. They show, however, that the original instrument is remarkable for its omissions. Thus the property partitioned is mentioned merely as "a tract of land used as a pasture, * * * situated in the southwest of Lake Barataria," on both sides of Bayou Cheti Tamaha, and which the appearers had inherited from their mother and grandmother, Jeanne Catherine Villars, deceased wife of Charles Jean Baptiste Fleuriau. Not one of the signatures corresponds to the name of the appearer as recited in the body of the instrument, and no signature of the notary is to be found. But as both sides concede that the partition was effected, and that Mrs. Charbonnet thereby became the owner of the land bounded, as shown on the sketch, north and west, by Bayous Cheti Tamaha, or Vacherie, and Coquille, south,

by the 40-arpent line, and east, by the Harang Canal and the lakes which are called, variously, Barataria, Ouacha, Catahoula, Des Allemands, and Salvador, we accept those conclusions. It appears from the evidence that the tract so bounded embraces somewhat less than 20,000 acres, so that, if the call of the original concession (for 45.986½ arpents) be correct, the Livaudais heirs got much the better of the partition, and if the government survey of 1839, calling for 121.029 acres, be correct the advantage obtained by them was stupendous. And, as it also appears from the evidence here adduced that they considered that they had acquired, not only the land lying to the north of Bayou Cheti Tamaha, but that lying to the west of Bayou Coquille, as well, no western boundary having been mentioned in the partition and no other bayou than Cheti Tamaha having been taken into account, it is evident that, whether the advantage obtained by them is correctly represented by the figures stated or not, it was unquestionably great. The act of partition was recorded in the parish of Lafourche on December 19, 1905, 83 years after its execution.

The muniment of title next offered by plaintiffs is an instrument purporting to be an act by private signature executed by Louis and Fleuriau Charbonnet and F. Dugué, for himself and his brothers, bearing date November 17, 1813, and which, at the request of F. Dugué appearing as the vendee, was registered in the office of Narcisse Broutin, notary in New Orleans, on December 27, 1813, and recorded in the parish of Lafourche on December 14, 1912, some 99 years later. It reads as follows:

"I, undersigned, acknowledge to have sold, ceded and conveyed to Messrs. Phpe Ænoul, F. Dugué and Charles Livaudais all my rights in the portion of land situated between the Bayou de la Vacherie, the lands of the Lafourche and a line which should start from the bank of the Bayou de la Vacherie, on the other side of the willows that are found at the end of the levee of shells bordering on the said bayou, and pass between the petit bois and the chactos. All, for the sum of $1,000, received cash—obligating myself to sign an act to the same effect, before a notary, the first time that I should go to the city. At the Vacherie, this, Wednesday, November 17, 1813.
"[Signed]    L. Charbonnet.
                "Fleuriau Charbonnet.
"The words five hundred erased, null; the word thousand interlined, approved.
"As well for me as, by procuration, for my brothers.    ·    [Signed] F. Dugué."

An act by the Livaudais brothers and Louis Harang, executed before Lavergne, notary in New Orleans, on January 11, 1820, shows that, as part settlement of a partnership between the appearers, Philippe Livaudais conveyed to his brothers Joseph and Charles his one-third interest in the land as described in the instrument last above quoted, concerning which third the act contains the following recital, to wit:

"Lequel tiers forme le part qui appartient au dit sieur vendeur dans la dite portion du terre, attendu qu'il en à fait l'acquisition, conjointment avec les sieurs acquireurs, de Mr. Louis Charbonnet et demoiselle Fleuriau Charbonnet, par act sous signatures priveés enregistré en cette étude le vingt-sept Decembre, mil huit cent treize."

From the expression, "en cette étude," we infer that Lavergne succeeded to the office of Broutin, as notary; but, at all events, there seems no doubt that the act under private signature, thus referred to, was the act of November 17, 1813, which as we have stated, was registered in Broutin's office on December 27, 1813. The above-quoted act of January 11, 1820, was recorded in the parish of Lafourche September 8, 1906, 86 years after its execution.

By act before Felix D'Armas, notary in New Orleans, of February 26, 1828, Joseph and Charles Livaudais conveyed an undivided one-third interest in the tract described in the act under private signature, so registered in Broutin's office, to Louis Harang, the father of the plaintiffs, but the conveyance

was not recorded in the parish of Lafourche until December 14, 1912, 84 years later.

Plaintiffs offered (subject to defendant's objection) an act executed before Seghers, notary in New Orleans, on July 19, 1839, whereby Charles Livaudais makes a dation en paiement to his brother Joseph of his third interest in the Vacherie land, as heretofore described, and wherein it is recited that Joseph Livaudais requested the notary to register in his office the act under private signature of November 17, 1813, which is recited in full, and which had been registered, in 1813, in Broutin's office; the act in which it is thus recited having been recorded in the parish of Lafourche on July 19, 1839, the day of its execution.

Mrs. Marie Jeanne Touton Énoul Dugué Livaudais, first wife of Louis Harang, died probably in 1833, and in 1837, the parish judge of "Lafourche, interior," acting under a commission from the First judicial district court, made an inventory of the property found in his jurisdiction which belonged in community to her heirs and her surviving husband, included in which was "an undivided fourth of the Vacherie tract * * * which Vacherie tract" reads the description, "is situate behind the riparian lots on the left bank of Bayou Lafourche, beginning at the upper limit of Evariste Lepine's plantation and ending at the lower limit of Madame Cadet Elie's plantation," which description locates the property to the westward of Bayou Coquille, as shown on the sketch, and shows that it was part of the land which the Livaudais heirs considered that they had acquired by the partition of 1812. At what time the second wife of Louis Harang died does not appear, but it is shown that he died on December 16, 1859, and that, on June 30, 1868, the plaintiffs herein, with their full sister Mrs. Cherbonnier, presented a petition to the district court for the parish of Jefferson, in which they alleged that he had left five children by each marriage; that, according to his will, the children of the first marriage were entitled to one-third of his estate and those of the second marriage to two-thirds; that they were children of the second marriage; that the administrator had filed an account showing that he had $11,605.89 in his hands for distribution among the heirs; that the account had been homologated, and that they were each entitled to be paid $1,547.45⅓, for which they prayed judgment; and, the administrator acquiescing, there was judgment accordingly, and they were presumably paid. In January, 1913, plaintiffs and others, issue of, or descendants from both marriages, as we assume, presented a petition to the same court, which has not been copied in the transcript upon which they obtained, ex parte, a judgment recognizing them as the sole heirs at law of Louis Harang and Marie Livaudais, his wife, and sending them into possession of the estates of those decedents in certain designated proportions, "and particularly of the following described real estate," after which follows a description of the property included in the shaded area as shown on the subjoined sketch.

So far as we are able to discover, that property was never inventoried in either the succession of the first Mrs. Harang or in that of her husband, and neither she nor he ever asserted or recorded any title to it in the parish of Lafourche until about two months before the institution of this suit, save as included, by way of recital, in an act between other parties, and have never exercised any dominion over, or paid any taxes on, it. And the judgment purporting to put them in possession of it, being ex parte is, of course, inoperative as to any other person having rights to assert, and is so admitted by plaintiffs, since they are here seeking to be put in possession.

Defendant has also introduced considerable

documentary evidence, including the following:

An act of mortgage before D'Armas, notary in New Orleans, of date March 24, 1834, in which the firm of "Dugué Freres & Louis Harang," composed of Joseph and Charles Dugué (Livaudais) and Louis Harang, acknowledge an indebtedness to the firm of Plique & Le Beau of $27,000, for which the debtor gives its notes secured by mortgage on different pieces of property, including their five-eighths interest, or more, in "the tract of land generally known under the name of 'the Vacherie' in the parish of Lafourche, interior, on the left bank of Bayou Vacherie," excepting therefrom land sold to Derbigny & Le Breton, Collins, Flowers and Nicholas, the undivided two-thirds of another tract having a front of 178 arpents on Bayou Lafourche by 40 arpents in depth, their undivided five-sixths interest in 11 slaves, and other property. The debt was for money borrowed, and seems to have been of rather a pressing character, but it does not appear to have occurred to the debtors to include the land here in dispute in the mortgage; to the contrary they seem to go somewhat out of the way to declare that the "Vacherie" lands found upon the right bank of Bayou Vacherie belong to the Charbonnet family.

An act of sale and partition before Seghers, notary in New Orleans, of date March 31, 1838, which was the result of a suit brought by children of Philippe Livaudais, then deceased, against their co-owners of lands held in indivision by them, and "commonly called the Vacherie of Messieurs Dugué Livaudais, situated in the parish of Lafourche, interior, and bounded by the inhabited lands fronting Bayou Lafourche, beginning 40 arpents from the bayou, and, on the other sides, by Bayou Bœuf, Bayou des Allemands and the plantation of Charles Derbigny, according to a plan by Bourgerol, deputy United States surveyor of date August 25, 1835," etc.

The instrument in question contains the recital that the land so described was included in the grant to Dubreuil, the confirmation to Fleuriau, and the partition between Madame Charbonnet and the Livaudais heirs, and for the purposes of the sale it was divided into 60 lots, of which 6 were sold to "Joseph Énoul Dugué Livaudais," 6 to the three minors, "Énoul Dugué Livaudais," and 7, including lot 46, according to the Bourgerol plan, to "Charles Énoul Dugué Livaudais."

From other instruments offered by defendant and the recitals therein contained it appears that Louis Charbonnet, Juste Barthelmy Charbonnet, and Mrs. Anais Charbonnet, wife of François Numa Plique, were the sole heirs of Mrs. Marie Melanie Charbonnet, wife of Louis Charbonnet, and that the entire tract acquired by her in the partition of August 29, 1912, including the land lying between the 40 and 80 arpent lines, was considered as having been inherited and was disposed of by them, or their heirs and successors, or supposed successors, in title as follows:

On October 9, 1843, Louis Charbonnet sold, by the following description, to François Numa Plique a one-third interest which, according to the recitals of the act, he had just inherited from his brother Juste Barthelmy Charbonnet, to wit:

"The undivided third of a tract of land known under the name of Vacherie, situated in the parish of Lafourche, interior, in this state and measuring twenty thousand and sixteen and fifty one hundredth of an acre in area; bounded, on the one side by a bayou which separates it from the property of Mr. C. Derbigny, on the side of the Lafourche, by the property of Mr. Énoul Dugué Livaudais and on the other by Lake Barataria and the land of the United States."

On April 27, 1850, Plique sold by practically the same description the interest which he had thus acquired to Louis Le Beau.

On April 24, 1851, the one-third interest which had been inherited by Mrs. Anais

Plique from Mrs. Marie Malanie Charbonnet, was sold in Mrs. Plique's succession to Louis Le Beau. On July 5, 1867, the heirs of Louis Le Beau sold to A. B. Charbonnet an undivided one-half of an undivided one-third interest in the property.

On May 15, 1875, the heirs of Louis Le Beau represented by F. Edgar Le Beau, sold the remaining undivided half interest which the decedent had acquired to Oscar Lepine. On October 30, 1867, the succession of Louis Charbonnet sold to A. B. Charbonnet the one-third interest which the decedent had acquired as the heir of his wife.

On October 2, 1875, the succession of A. B. Charbonnet sold to Oscar Lepine, by quitclaim deed, "an undivided one-half" or whatever interest the succession might have in the property.

In the sale to Louis Le Beau, in the succession of Mrs. Plique, on April 24, 1851, the description reads:

"An undivided third of a tract known as the Vacherie Charbonnet, of which one-third already belongs to the said Louis Le Beau and the other one-third belongs to the said Louis Charbonnet. The said pasture is composed of twenty thousand and sixteen and $^{56}/_{100}$ (20,016$^{56}/_{100}$) acres, more or less, in superficies, bounded by the Bayou la Vacherie, which separates it from the plantation, now or late, of Charles Derbigny and which is navigable as far as Lake Ouacha, or Barataria, by Bayou Catahoula, and by lands, now or lately, belonging to Messrs. Enoul Dugué Livaudais, the whole, according to a plan of A. H. Rightor, deputy surveyor."

In March, 1871, the Derbigny plantation was sold by Mr. Derbigny to the Consolidated Association of the Planters of Louisiana.

In 1870, 1871, and 1872 there was an assessment in the parish of Lafourche, in the name of "Le Beau and Charbonnet," as follows:

"Twenty thousand (20,000) acres, being back of the plantation of the Consolidated Association of Planters and contains fractions of T. 15 and 16 S. E. D. R. 18 or 19 E."

In December, 1873, the tax collector, proceeding in accordance with section 4 of Act

143 LA.—32

47 of 1873, made an adjudication of the land so assessed to Oscar Lepine, and on December 18, 1873, executed a deed, in which he described it as follows, to wit:

"A certain tract of land situated in the parish of Lafourche, interior, and lying back of the plantation belonging to the Consolidated Association of the Planters of Louisiana, in the settlement known as Vacherie Dugué Livaudais and designated on 'the map of the parish of Lafourche as part of the B. Florian claim and containing fractions of townships 15 and 16, South Eastern district, range 18 or 19, east, the number of acres unknown, but, according to the assessment rolls, the tract of land above described and sold is supposed to embrace an area of about 20,000 acres, the same having been seized for the payment of taxes due by Le Beau and Charbonnet, as owners thereof, according to the tableau and assessment rolls for the years 1870, 1871 and 1872."

The auditor's deed, of date July 23, 1874, contains the same description. Lepine, it appears, went into possession of, and pastured his cattle upon, the entire tract lying to the northeast of the 40-arpent line, as indicated on the sketch, until April 8, 1880, when he, made a sale to John R. Gheens of the cattle and part of the land, the latter being described as:

"All that portion of the following described tract of land lying and being back of the 80-arpent line from Bayou Lafourche, to wit: A certain tract of land known and designated as Vacherie Charbonnet, comprising twenty thousand and sixteen arpents and fifty-six hundredths of an acre, in superficies, situated in the parish of Lafourche, in this state, and bounded by the Bayou la Vacherie which separates it from the plantation, now or late, of Charles Derbigny and which is navigable as far as Lake Washa, or Barataria; by Bayou Catahoula; and by lands, now or late, belonging to Enoul Dugué Livaudais; the whole according to a plan of A. H. Rightor, deputy surveyor. The portion of land lying and being in front of the said 80-arpent line is reserved and not included in this sale—was sold by the present vendor to Messrs. Foret and Le Blanc, though the act of sale is not yet passed."

Gheens took over 400 head of cattle with the land and he and his successors in title pastured their cattle there for a number of years, and discontinued so doing on account of a season of high water, indicating in that

way, and otherwise, that they considered that the shaded tract as shown on the sketch was included in the sale from Lepine.

On January 24, 1890, Gheens sold the property to the Golden Ranch Sugar & Cattle Company, and that company, in July, 1910, instituted suit in the district court, alleging that at the time of the tax sale the property appeared to be owned by Louis Le Beau, Arthur B. Charbonnet, and Mrs. George Richard Beard, and praying for citation of Mrs. Beard, whose whereabouts were alleged to be unknown, through a curator ad hoc and for judgment confirming the sale and quieting the title resulting therefrom; and on September 27, 1910, there was judgment accordingly. The property then passed back to Gheens, by whom it was conveyed to Garnett and Morrill, who in November 3, 1910, conveyed it to the plaintiff, together with other lands, by an act before Loomis, notary in New Orleans, which declares that:

"The lands herein sold are delineated upon a plat compiled by Daney & Waddill, civil engineers of New Orleans, duly paraphed by me, notary, and on file and of record in my office."

The plat thus referred to bears date January 3, 1906, and was prepared under the following circumstances: John R. Gheens and his brother constituted in effect the Golden Ranch Sugar & Cattle Company, and in 1905 they were negotiating with some Chicago capitalists for the sale of its property, including what had been the Derbigny plantation. The representatives of the prospective purchasers found some objections to the title that was tendered, and, among them, that it did not include the tract here in dispute. Mr. Gheens was of opinion that the title did include that tract, and the negotiations with the gentlemen from Chicago having failed in their purpose, he employed Mr. Waddill, of Daney & Waddill to make a survey of the entire holdings of the Golden Ranch Sugar & Cattle Company, without reference (so Mr. Waddill testifies, though

Mr. Gheens denies the restriction) to the line "N 9 W," and the result of that employment was the compilation above mentioned. The difference of opinion appears to have arisen from the fact that there is in existence a plat of survey with field notes of the entire Fleuriau grant, made by A. F. Rightor, deputy surveyor, on October 18, 1839, which is an official document, duly approved by the Surveyor General, and placed of record in the Land Office, and that there was also produced during the negotiations mentioned a lithographed auctioneer's plan, or advertisement, purporting to be a "survey of part of the claim of Charles F. B. Fleuriau," also by A. F. Rightor, deputy surveyor, whereon appeared the line "N 9 W," which plan was thought by the Chicago party to be that referred to in the act of sale from Lepine to Gheens, of April 8, 1880, and which line was thought to be that described in the act under private signature of November 17, 1813, upon which plaintiffs predicate their claim. The particular copy of the lithograph in question which was offered in evidence, as an ancient document, was produced by Mrs. F. Edgar Le Beau, widow of the gentleman by that name, who testified that she had found it among her husband's old papers, that she had often seen it in his hands, and that certain pencil memoranda which appear on it are in his handwriting. The paternity of the document is, however, not established; it does not appear ever to have been attached to, or identified with, any act of conveyance, or deposited or recorded in any public office; and, though apparently intended for use as the auctioneer's advertisement of land to be sold in the succession of Mrs. Plique, could not well have been so used, since it purports to advertise, as the property of that succession, the whole of a body of land of which the succession owned but an undivided one-third, and it attributes to the tract indicated on our sketch as lying to the eastward of the line N 9 W an area of

20,016.56 acres, whereas the entire body of land, including the shaded area and that lying between the 80 and 40 arpent lines, contains considerably less than that acreage, and the particular tract indicated contains only about 12,000 acres. The plan appears to have been taken from the original survey by Rightor, to which was added the line "N 9 W, on the west, or south west side of which is the name Énoul Dugué Livaudais" in pencil, the writing, it is said, being that of F. Edgar Le Beau, the husband of the lady who produced the document. Looking at it, as a document of the kind is ordinarily viewed, i. e., upon the theory that the bottom represents the south side of the lands exhibited, the line N 9 W appears to run rather west 9 degrees north than north 9 degrees west, which makes it appear that the "lands of the Lafourche" lie to the south of the line, whereas the line is supposed to have been run N 9 W from those lands, and there lie to the westward of it, first, the shaded area, and, next, "lot 46, Bourgerol plan," which was acquired by Charles Énoul Dugué Livaudais in the partition of 1838. Among the lands of the Lafourche it will be observed that there is a tract bearing the name "J. E. D. Livaudais," which is said to bound the upper tract for a distance of a mile and a quarter, but leaving, as plaintiffs assert, a gap in the boundary on that side, as described in defendant's title of some four or five miles.

The document now under consideration appears to include all the land represented on our sketch, to the westward of the line N 9 W, and more besides, but the acreage, "20,016.56 acres," is inscribed on the tract lying to the eastward of that line. It (the document) bears the legend:

"Sale without Reserve of 20,016.56 Acres of Land. Succession of Mrs. Anais Plicque, Wife of P. L. Plicque, by P. E. Tricou, Auctioneer.

"By virtue of an order from the honorable the second district court, * * * will be sold, on Monday, April 7, 1851 * * * the property hereinafter described:

"A tract of land known as 'Vacherie Charbonnet,' situated in the parish of Lafourche, interior. This land is bounded by Bayou la Vacherie, which divides it from the plantation of Charles Derbigny and is navigable through its entire course to its junction with Lake Washa, or Barataria; by Lake Washa, or Barataria; by Bayou Catahoula; and by the tract of land, now or formerly, belonging to Messrs. Énoul Dugué Livaudais, the whole according to a plan drawn by A. F. Rightor, deputy surveyor."

And then follows rather a glowing description of the land, its hunting and fishing advantages, etc.

The act of sale, of date April 24, 1851, before Mazureau, notary, contains the recital that there had been adjudicated—

"to Mr. Louis Le Beau * * * [not the whole property, as advertised, but] * * * the undivided one-third of a tract of land [following the description contained in the legend on the plan] the whole in conformity with a plan by A. F. Rightor, deputy surveyor."

The inference to be drawn from the confusion thus disclosed would seem, perhaps, to be that the person who prepared the plan, and, presumably the legend purporting to explain it, proceeded and was written upon the theory that the "Vacherie Charbonnet" consisted of the tract lying to the eastward of the line "N 9 W" and north of the 40-arpent line, or "the lands of the Lafourche," that that tract contained 20,016$^{56}$/$_{100}$ acres, and that the whole of it was to be sold; and, as that impression was entirely erroneous, it would follow that the sale, as evidenced by the notarial act, was not made according to the plan, nor could have been so made. Beyond that, as the plan was not identified by date, registry or deposit with the act, and as Rightor may have drawn another plan, or many more, no one can say that the particular plan which has been offered in this case is that to which the act refers, and still less can any one say that Mr. Gheens, buying property nearly 30 years later, in the parish of Lafourche, where, so far as we are informed, that plan had never been seen or heard of, should have assumed that it, rather than

the official survey by Rightor, duly recorded in the proper office, was "the plan of A. F. Rightor, deputy surveyor," to which his act of purchase referred. In view of the use of the name, "Énoul Dugué Livaudais" in the description, in the sale from Lepine to Gheens, it may be pertinent to explain that the Livaudais brothers, and the sister, seem all to have borne the names Énoul Dugué, and, as was not altogether uncommon in some families of French and Spanish descent, they used their other family names quite frequently to the exclusion of the name derived from their father. Thus in the partition of 1812 François Joseph Énoul Dugué Livaudais appears, by signature, as F. Dugué; Charles Énoul Dugué Livaudais, as C. Livaudais Dugué, Philippe Énoul Dugué Livaudais, as Phpe Énoul Dugué, Marie Jeanne Touton Énoul Dugué Livaudais, as Touton Énoul. In the instrument under private signature of November 17, 1813, upon which plaintiffs rely, the Livaudais brothers are described as Phpe Énoul, F. Dugué, and Chas. Livaudais. The signature representing the three is "F. Dugué." Mrs. Marie Melanie Charbonnet is represented by the signature "Fleuriau Charbonnet," and in the act of January 11, 1820, between the Livaudais brothers and Louis Harang, the person who is supposed to have affixed that signature is referred to as "demoiselle Fleuriau Charbonnet." When to that we add that the Vacherie Dugué Livaudais was frequently confused with what was properly, after the partition of 1812, the Vacherie Charbonnet, and that the Vacherie Charbonnet was, from that date, partly bounded, on the west and south, by Énoul Dugué Livaudais lands, the fact that it was so described in the sale from Lepine to Gheens is not surprising. The description is at least as definite as applied to the Vacherie Charbonnet, meaning the entire tract acquired by Mrs. Charbonnet in the partition of 1812, as is the description in the act of partition or that in the act by private signature of November 17, 1813, on which plaintiffs bring this action.

A year or two after the failure of the negotiations with the Chicago people, and five or six years prior to the institution of this suit, Mr. Gheens, acting upon advice, built a fence upon the 80-arpent line, as an additional method of asserting possession of the land here in dispute; and, as plaintiffs allege actual possession in the defendant company, we understand it to be conceded that such actual possession has been maintained at least since the fence was built.

Dominique Harang, plaintiff herein, was born within a mile or two of the land in dispute, and made it his hunting ground, whenever it so pleased him, during the greater part of his life; but though he and his co-plaintiff attained their majorities as far back as 1868, the title which they now set up was never, as such, registered in the parish of Lafourche until 1912, and no claim under that title appears to have been asserted until within a short time prior to the bringing of this action, in December, 1913.

### Opinion.

[1] The question which meets us at the threshold is, whether the plaintiffs have now the right to prosecute this suit, or whether the delay within which that right might have been exercised has not elapsed; in other words, whether the action is not barred by the prescription of 30 years, liberandi causa. "Title xxiii" of the Civil Code treats of "Occupancy, Possession and Prescription"; chapter 3 of that title of "Prescription," and section 1 of that chapter, under the rubric, "General Provisions," contains the following:

"Art. 3457. * * * Prescription is a manner of acquiring the ownership of property, or discharging debts, by the effect of time, and under the conditions regulated by law. Each

of these prescriptions has its special and particular definition.

"Art. 3458. * * * The prescription by which the ownership of property is acquired, is a right by which a mere possessor acquires the ownership of a thing which he possesses by the continuance of his possession during the time fixed by law.

"Art. 3459. * * * The prescription by which debts are released is a peremptory and perpetual bar to every species of action, real or personal, when the creditor has been silent for a certain time without urging his claim."

Section 2 of chapter 3 deals with the "Prescription by which the Ownership of Property is Acquired," generally known as the "prescription acquirendi causa," and we pretermit its consideration, though it also is pleaded and urged on behalf of defendant, further than to call attention to article 3499, which declares that:

"The ownership of immovables is prescribed for by thirty years without any need of title or possession in good faith."

Section 3 of chapter 3 deals with the "Prescription which operates a Release from Debt," and the following articles are to be found therein, to wit:

"Art. 3528. * * * The prescription which operates a release from debt discharges the debtor by the mere silence of the creditor, during the time fixed by law, from all actions, real or personal, which might be brought against him.

"Art. 3529. * * * This prescription has also the effect of releasing the owner of an estate from every species of real rights, to which the property may have been subject, if the person in possession * * * has not exercised it during the time required by law.

"Art. 3530. * * * To enable the debtor to claim the benefit of this prescription, it is not necessary that he should produce any title, or hold in good faith; the neglect of the creditor operates the prescription in this case."

"Art. 3548. * * * All actions for immovable property, or for an entire estate, as a succession, are prescribed by thirty years."

Under "Title 1. Of Successions" (chapter 6, section 2) we find:

"Art. 1030. * * * The faculty of accepting or renouncing a succession becomes barred by the lapse of time required for the longest prescription of the rights to immovables."

The article last quoted was applied in Succession of Waters, 12 La. Ann. 97, and it was there held, quoting the syllabus, that:

"The heir who has permitted 30 years to elapse without having done any act showing an intention to accept the succession is barred by prescription from any rights as heir."

Chief Justice Merrick, as the organ of the court, said, in the course of the opinion handed down by him:

"Did the article read, simply, the faculty of accepting an inheritance becomes barred by the lapse of time required for the longest prescription of the rights to real estate, it would present no difficulty, and we could have no hesitation in concluding that the heir who should suffer 30 years to elapse without evincing his intention to accept a succession then opened would lose his right of accepting, and the inheritance could not be claimed by him, into whose hands whosoever it might have gone."

A difficulty was found, however, in construing the prescription of the "faculty of accepting" with that of renouncing, and, after considering the views of Marcadé and other French commentators, with no satisfactory result, the court said:

"We therefore, conclude that the Legislature intended to declare, in one part of the article, that, if he who is called to an inheritance is silent for 30 years, and does no act evincing his acceptance of the succession, he is barred by prescription. We do not find it necessary to put any construction upon the second portion of the article. It will be in time to consider the difficulties presented by it whenever the case arises in which their explanation, if possible, is required."

Mr. Justice Spofford, in a concurring opinion, seems to reach the conclusion that, construing the provisions of the article in question with the provisions of other articles of the Code, as well as inter sese, it is impossible to apply the prescription of the faculty of accepting without also giving effect to the prescription of the faculty of renouncing, differing in that respect from Marcadé, who held that the similar article of the Code Napoléon merely established a prescription against the right to choose between accept-

ance or renunciation, and operated an acceptance at the end of the period:

"I think," said the learned justice, "the Legislature of Louisiana intended, in article 1023 [now 1030], to fix a term of prescription against the right of acceptance, and to intimate the consequence of its lapse without an acceptance; that consequence, I think, is that the successible becomes a stranger to the succession."

We are not here dealing with the prescription of the faculty of accepting or renouncing a succession which is a faculty that may be exercised, at any time, by any person, sui juris, without let or hindrance from or awaiting the action of, any other person. The plaintiffs in this case accepted the succession of their father in 1868, when they demanded and obtained judgment for their respective shares of the assets of the succession, then in the hands of the administrator, but, having done so, they thereafter remained silent for 45 years, making no claim to, and bringing no action for the recovery of, the immovable property which they now allege devolved on them by virtue of that acceptance, and the action which they now bring appears to be one which the law declares that they have no standing to bring. Whilst, however, in the matter of the prescription of the faculty of accepting or renouncing a succession, a definite point of departure is established by the death of the de cujus, and the heir who desires to accept or renounce is not obliged to find another person, contradictorily with whom to take such step, the bringing of an action involves the finding of a cause of action and of a person against whom it may be asserted; and, until the cause and the person are found, and the action will lie, it can hardly be said that any prescription will run against the right to bring it. It is true that article 3459 declares that "the prescription liberandi causa, or that by which debts are released, is a peremptory and perpetual bar to every species of action, real or personal, when the creditor has been silent for a certain time without urging his claim," but a release from debt implies the existence of a debtor, and in the matter of immovable property implies, in the case provided for by the article, the existence of one who withholds the property from the owner, under an adverse claim, and which therefore requires the bringing of an action for its recovery. If, then, during 30 years or a longer period, no one asserts, or pretends to have acquired, any adverse rights to such property, whether of title or possession, and the rights of the owner are not thereby challenged or invaded, no occasion can arise for his breaking his silence concerning them, since, under such circumstances, he is at liberty to exercise or enjoy them in his own way. From the moment, however, that the rights of the owner, not in possession, are challenged, or invaded, by one who sets up an adverse claim of title, or possession, the relation of debtor and creditor, within the meaning of the law declaring the prescription liberandi causa, is established, and if the pretensions of the debtor are of such a character as to authorize or require an action at law, on the part of the creditor for the vindication of his rights, the period, at the end of which the prescription against such action becomes effective, begins and, if the creditor remains silent until it is completed, he loses, not only his right to complain that the title asserted by the debtor is defective, or no title, or that his possession is not such as to enable him to hold the property as owner, but the right to bring any action at all, since the prescription operates as "a peremptory and perpetual bar to every species of action, real or personal," in which his complaints might be urged. "Prescription attaches to a right from the moment that it can be exercised." Andrews v. Rhodes, 10 Rob. 53; Darby v. Darby, 120 La. 850, 45 South. 747, 14 L. R. A. (N. S.) 1208, 14 Ann. Cas. 805.

"To enable the debtor to claim the benefit of this prescription it is not necessary that he should produce any title;" nor is it necessary that he should hold in good faith; nor, if possession be relied on, does it make any difference whether it be actual or constructive.

"The prescription which operates a release from debts discharges the debtor, by the mere silence of the creditor during the time fixed by law, from all actions, real or personal, which might be brought against him." The right which plaintiffs are here asserting might have been exercised in 1873 or 1874, when Oscar Lepine recorded his tax title and went into possession of the property which had been assessed to Le Beau and Charbonnet as embracing an area of about 20,000 acres, and which must have included the tract in dispute in order to have embraced that area. To the contention that the description did not identify the property and that Lepine did not take actual possession of the tract in dispute, the answer is that he went into possession of the property which had been acquired, and was held, by Le Beau and Charbonnet, under recorded titles, as the "Vacherie Charbonnet"; that no other title to the property so described was at that time recorded in the parish; that, whether the tract in dispute was then included in the Vacherie Charbonnet or not, he had good reason to believe that it was, and, acting upon that belief, turned his cattle loose, .to graze upon that tract as upon any other part of the property, and later sold, or agreed to sell, to Foret and Le Blanc the tract lying between the 80 and the 40 arpent lines, which is as much a part of the land described in the title set up by plaintiffs as the tract included in the shaded area, and in fact was actually claimed by them in this suit, and is now claimed in another suit against other defendants. Moreover, Gheens considered that the tract in question was in-

cluded in his purchase from Lepine, and from that time (1880) has always assumed the quality and exercised the rights of an owner, all to the knowledge of the plaintiff, Dominique Harang, as will be understood by the following testimony given by Harang, in an examination by his own counsel, to wit:

"Q. Mr. Harang, did you ever erect a cattle shed, or cattle pen, on the land claimed by Mr. Gheens? A. Yes, sir. Q. Did you ever converse with Mr. Gheens with reference to the destruction of that cattle shed? A. Yes, sir. Q. Please relate to the court what took place on that occasion. A. Mr. Gheens called at my house and told me that he heard that I had erected a pen on his property. I told him that was true, I had erected a pen, but· that I did not know that it was his property. He claimed that it was, and that he was coming there and burn it, and I told him that, whenever he felt ready, if he would notify me of the day and hour, I would meet him with a can of five gallons of gasoline and help him burn it. I asked him if he really meant what he said; he smiled and said, 'Yes.' Q. What year was that? A. 1882 or 1883."

On his cross-examination, he said that, as subsequently ascertained, the pen was not on the land claimed by Gheens, but was on the tract lying between the 80 and 40 lines, which had been sold by Lepine to Foret and Le Blanc.

Our conclusion then is that the prescription of 30 years liberandi causa is applicable to the case, and should have been sustained. To the contention that its application amounts to a taking of plaintiffs' property without due process of law we answer, in the language of the Supreme Court of the United States, quoted with approval by this court, as follows:

"Prescription is a thing of policy, growing out of the experience of its necessity; and the time after which suits or actions shall be barred has been, from remote antiquity, fixed by every nation, in virtue of that sovereignty by which it exercises its legislation for all persons and property within its jurisdiction." M'Elmoyle v. Cohen, 13 Pet. 312, 10 L. Ed. 177; Terry v. Heisen, 115 La. 1083, 40 South. 461.

For the reasons thus assigned, the judgment appealed from is set aside and annul-

led, the demands of the plaintiffs rejected, and this suit dismissed at their cost in both courts.

O'NIELL, J., dissents. PROVOSTY, J., dissents and hands down reasons. See 79 South. 777.

LECHE, J., concurs in the decree.

### On Rehearing.

PROVOSTY, J. The three Messrs. Livaudais made a partition with their aunt, Mrs. Charbonnet, of a large area of swamp land situated in Lafourche parish, near the Gulf. Mrs. Charbonnet got all that part situated south of a bayou known as Bayou Vacherie. Of this land the defendant's brief says:

"The land is wild unreclaimed swamp land. Until recently it was of practically no value. The whole 20,000 acres was at one time appraised at $900, less than 5 cents per acre."

In 1813, one year after the partition, Mrs. Charbonnet sold to the Livaudais brothers for $1,000 the southwestern part of this area by the following boundaries:

"The Bayou Vacherie, the back line of the lands fronting on Bayou Lafourche, and a straight line which will have to start from the bank of Bayou Vacherie on the other side of the willows which are at the end of the embankment of shells which borders said bayou, and which line will go and pass between the little woods and the chactos."

The property thus sold is the property in controversy. The defendant holds title under Mrs. Charbonnet, by mesne conveyances, and the plaintiffs, under the Livaudais brothers. The line, which was to start on the bank of Vacherie bayou at the end of the embankment of shells and go and pass between the little woods and the chactos, was located years ago by a surveyor named Rightor. One question in the case is whether this line was thus correctly located, and, if not, whether it is possible at this late day to locate it more correctly. We think the evidence shows that this line was correctly located. In several of the deeds under which defendant holds, this survey is referred to as part of the description of defendant's land. The deeds also refer to the land of the Messrs. Livaudais as one of the boundary lines. Very true, defendant's learned counsel would apply the latter references to a tract of land owned by a Mr. Livaudais 40 acres further, so that the land in dispute would be included in defendant's title deeds. But this distant tract would be a boundary for the property for only about one-fifth of the distance, leaving some four miles of the distance without any boundary line at all on that side; and, in the second place, the references are to the lands of "the Messrs. Livaudais," which could only mean the three Livaudais brothers, and not to Mr. Livaudais. Mrs. Charbonnet certainly did sell to the three Livaudais brothers the southwestern part of the area acquired by her in the partition, and this line was certainly surveyed and platted years ago as correct.

Defendant's more serious reliance is upon a tax sale and on prescription. The tax sale was made in 1873 for taxes assessed to Le Beau and Charbonnet, two of defendant's authors in title, and by the following description:

"A certain tract of land situated in the parish of Lafourche, interior, lying back of the sugar plantation belonging to the Consolidated Association of Planters in the settlement known as the Vacherie Dugué Livaudais, and designated on the map of the parish of Lafourche as a part of the B. Florian claim and containing fraction of T. 15 and 16 S. E. district, R. 18 or 19 E. The number of acres unknown, but according to the assessment rolls the tract of land above described and sold is supposed to embrace an area of about 20,000 acres, being the property of Le Beau and Charbonnet, as per assessment roll of the state of the years 1871 and 1872, to satisfy a debt due said state for the unpaid taxes of 1871 and 1872."

Of this description the plaintiffs' brief correctly says:

"The description (?) in the tax deed places the property in different townships and ranges,

3 to 12 miles from our property; it gives absolutely no boundaries; it says the property is. in the Vacherie-Livaudais, whereas our property is in the Vacherie-Charbonnet; it says it is the property of Le Beau and Charbonnet, whereas these gentlemen never owned our property; it says it is back of a certain plantation, whereas our property is in front of said plantation."

The tax purchaser caused his tax title to be confirmed by a judgment contradictorily with a curator ad hoc. In this judgment, and in the petition praying for the confirmation, the property sold, the sale of which is sought to be confirmed, is described as follows:

"A certain tract of land known as the Vacherie-Charbonnet, comprising 20,016 arpents and $^{56}/_{100}$ of an acre in superficies, and bounded by Bayou de la Vacherie, which separates it from the plantation now or late of Chas. Derbigny, and which is navigable as far as Lake Washa, or Barataria, by Bayou Catahoula and by lands now or lately belonging to Énoul Dugué Livaudais, the whole according to a plan of A. F. Rightor, deputy surveyor."

Suffice it to say of this tax sale thus confirmed that the description in it does not cover plaintiffs' land. The line of the Rightor survey, or, in other words, plaintiffs' land, is given as one of the boundaries.

Defendant relies upon the prescription of 30 years both acquirandi causa and liberandi causa.

Defendant does not pretend to have ever taken, or had, possession, except until recently, otherwise than in accordance with its titles; and these, as already shown, do not cover plaintiffs' land. Until recently the only kind of possession defendant had ever taken was by turning a herd of horned cattle loose to graze on this 20,000 acres of swamp land; it not being denied that the land was unfenced, until recently, and that the cattle of the entire neighborhood enjoyed the same grazing privileges.

It is also to be noted that in calling the area "wild swamp," the defendant's counsel pays it a compliment which the greater part if it does not deserve, being, as we judge from the maps, merely low Gulf coast marsh, with côteaux, or ridges, here and there on which cattle can safely range.

Much importance is attached by defendant, in connection with possession, to the fact that the titles of plaintiffs were not recorded in the recorder's office of the parish of Lafourche, whereas those of defendant were. But the registry of titles has absolutely nothing to do with the question of actual possession vel non. Actual possession can be shown only by visible outward acts upon the property itself of a character to challenge the attention of the owner of the property. The recordation of some document in the recorder's office is not such an act. An owner does not have to go and examine the records to see whether some one has not been recording something against his property, and, as a matter of fact no owner ever does such a thing. Article 3503 of the Code is express that the possession which is acquired without title, "extends only to that which has been actually possessed," and the titles recorded by defendant, if the Rightor survey line be adopted, did not include plaintiffs' land.

As to the nonregistry of plaintiffs' titles in the recorder's office of the parish of Lafourche at the time the several acts were passed, such recordation was unnecessary. Parish Board of School Directors v. Edrington, 40 La. Ann. 637, 4 South. 574. Such registry as was then required, namely, registry in the office of a notary, was had.

[2] Defendant has not shown the possession required by law for the prescription acquirandi causa; and, in fact, defendant's more serious reliance evidently is upon the prescription lberandi causa provided for by article 3548, C. C., reading:

"All actions for immovable property, or for an entire estate, as a succession, are prescribed by 30 years."

The contention is that an owner who, as plaintiffs did in this case, suffers 30 years to elapse without manifesting his ownership by some act, the property lying out for that length of time as if abandoned, loses his ownership, or, which is the same thing, loses his right of action to recover the property from any one who may have taken possession of it, even though the suit is filed the day after, or the day itself on which, the possession is taken.

The adoption of that conclusion would, to use the energetic expression of Baudry-Lacantinerie & Tissier, "bouleverser," i. e., throw into confusion, topsy turvy, our whole theory of prescription. De la Prescription, No. 594. It dispenses with possession; whereas possession, actual or constructive, is the very foundation of prescription. Prescription without possession is a house without a foundation. The rationale, raison d'être, function of prescription, is to quiet and stabilize things in the interest of society, so that, after a certain length of time, the possessor may not be disturbed and the debtor may not be troubled. By this new prescription the real owner is disturbed in his ownership and constructive possession, is thrown out of court, in the interest and for the protection of some usurper utterly without standing save his own wrong. A medicine is thereby turned into a poison.

The article of the Code Napoléon corresponding with our article 3548 reads:

"Art. 2262. All actions, real as well as personal, are prescribed by thirty years, without the one who invokes this prescription being obliged to produce a title, or its being possible to oppose to him the exception resulting from bad faith."

The question of whether this article, which, it will be observed, makes no mention of possession, dispenses the party pleading this prescription as against the petitory action or action in revendication of real estate from the necessity of showing the possession requisite for the prescription of 30 years acquirandi causa was raised for the first time in the case of Orvise v. The Brothers of St. Viateur, Sirey, 1879, vol. 1, p. 313, Journal du Palais, 1879, p. 777. In that case Orvise, the plaintiff, sued to recover a tract of land which his father had sold to the defendant religious association more than 30 years back. His ground of action was that the sale had been null, had not divested the ownership of his father, because, religious organizations being prohibited in France, these religious brothers had had no legal existence, and hence could not possibly have acquired the property. In the course of his argument Attorney General Robinet de Clery invoked this article 2262 as a bar to plaintiff's action in revendication as well as to the action in nullity of the sale. The court sustained the prescription, but, as shown in the argument of Counselor Pothier, reproduced in Journal du Palais, 1907, First Part, p. 276, sustained it only as to the action in nullity, not as to the petitory action. This argument of the Attorney General, reported in an annotation to the said decision as found in 1 Dalloz Rep. for 1880, gave rise to a discussion of the question by the law-writers of France. The reporter of the decision, a Mr. Beudant, indorsed the views of the Attorney General; and, so far as we have been able to ascertain, only one law-writer, Lacour, and that only in a review article, has coincided with him. All the other law-writers of France who have thought it worth while to discuss the question are on the other side: Laurent, vol. 32, No. 384; Huc, vol. 4, No. 245, and vol. 14, No. 434; Aubry & Rau (4th Ed.) vol. 2, pp. 322, 395, and vol. 8, p. 429; Baudry-Lacantinerie & Tissier (3d Ed.) Prescription, Nos. 593, 594, and long list of authorities cited in note 1. Finally, the question came up squarely before the Court of Cassation in the case of Cohu v. Morvan, Journal du Palais, 1907, p. 273, and

the prescription was held not to apply to the petitory action. The decision is short:

"Considering that, notwithstanding the sweeping terms of article 2262, according to which all actions, real as well as personal, are prescribed by 30 years, this text does not apply to the action in revendication by the owner who has been dispossessed of his real estate, that, ownership not being lost as the result of non-usage of the thing, the action in revendication which protects and sanctions this right can be exercised as long as the defendant does not establish that he has himself become owner of the real estate in question, as the result of a possession exhibiting all the characteristics required for the prescription acquirandi causa, whence it follows," etc.

The question had previously come up in Belgium, whose Code is on this point precisely the same as that of France, and been decided in the same way. See note to Laurent, vol. 32, p. 404.

Very true, article 3548 says that all actions are prescribed by 30 years, and says nothing of possession; but, says Morlon, in his commentary on article 2262, you must add, "under the conditions regulated by law." The clause here in quotation marks he takes from article 2219, C. N. (3457 of our Code). He continues:

"As to real actions, prescription is composed of two elements, lapse of time and possession. For I cannot lose my property simply, or the action in revendication which follows it, from the mere fact that I do not exercise it during 30 years. I can lose it only as the result of some one else acquiring it; and, for acquiring it, it is necessary, according to article 2229, to possess it for the required length of time."

Laurent, after having quoted the reason which Bigot-Preaenu, as the orator of the government in advocating the adoption of article 2262 of the Code Napoléon, had assigned, goes on to say:

"The assignment of reasons which we have here transcribed admits as a thing not doubtful that the 30 years' prescription is acquisitive, and that it is founded upon possession. Some have contested this, basing themselves upon article 2262, where nothing is said of possession, whence the conclusion that the owner lost his right from the simple fact that he failed to exercise it during 30 years. To do this, was to take advantage of an incomplete drafting,

and to go in opposition to the fundamental principle governing property. The owner does not lose his right as the result simply of his not using it; his right is to use or not to use his property. How can he lose his right by abstaining from using it when his right is not to use it? He continues to hold possession, and all the rights attached to it so long as another has not usurped it and dispossessed him. This is the unanimous doctrine of the law-writers, ancient and modern. * * * Prescription, then, may be invoked against the owner who revendicates only when the opposing party sets up against the owner an adverse possession uniting the conditions required by article 2229."

From Baudry-Lacantinerie & Tissier, De la Prescription, No. 594:

"The truth is there is no distinction to be made between the right of ownership and the action in revendication. Prescription is possible against the one or the other only if another person has possessed during the time and under the conditions required by law. Otherwise, by means of the prescription by which the action in revendication is extinguished, we should come to protecting a possessor who did not unite in himself the conditions hereinabove expounded, one who possessed only by precarious title, or whose possession had been discontinuous, unless it should be preferred in such a case to attribute to the state an ownership which had not been lost by the owner nor acquired by any one else. At all events there would be great injustice. Prescription which has been devised for making ownership more secure would result in the very opposite."

The arrangement, distribution, or classification of the subject-matter of prescription in the Code Napoléon is not the same as in ours. The two prescriptions, liberandi causa and acquirandi causa, are there dealt with together, instead of separately as in our Code. Basing himself upon this, the learned counsel for the defendant in this case contends that these French decisions and authorities are not applicable. The answer to that argument is that the principles of prescription embodied in the two Codes are absolutely the same. Both Codes are very largely, if not entirely, derived in the matter of prescription from Pothier's treatises, De la Propriété; De la Possession; De la Prescription; Introduction aux Coutumes D'Orléans, at the part dealing with Prescription; and Obligations. The French Code is more condensed than

ours, not expressing those things which follow as logical consequences; whereas ours expresses those consequences. That is the only difference. But what is thus expressed in our Code and not found in the Code Napoléon is found, mostly in the same words, in Pothier. Pothier in his treatise De la Propriété, has a chapter headed "Comment se Perd le Domaine de Propriété," "How Ownership is Lost." In this chapter he enumerates all the modes in which ownership may be lost; and any one familiar with his works knows that he may be trusted not to have overlooked or omitted any. Among the modes thus named by him, this mode of a prescription of 30 years liberandi causa, unaccompanied by possession, is not found. Of the prescription of 30 years he says:

"No. 276. Finally, we lose, without our consent, and even without our knowledge, the ownership of a thing belonging to us, when the one who has the possession of it acquires it by prescription. As soon as this possessor has, either by himself or through others, accomplished the time required for prescription, the law which has established the prescription, deprives us de plein droit [absolutely, pleno jure] of the dominion of ownership which we had of the thing, and transfers it to this possessor."

This is practically what our Code expresses by article 496, under the title "Of Ownership."

"Art. 496. The ownership and the possession of a thing are entirely distinct.
"The right of ownership exists independently of the exercise of it. The owner is not less the owner because he performs no act of ownership, or because he is disabled from performing any such acts, or even because another performs such acts without the knowledge or against the will of the owner.
"But the owner exposes himself to the loss of his right of ownership in the thing if he permits it to remain in the possession of a third person for a time sufficient to enable the latter to acquire it by prescription."

Where the framers of our Code would have got this idea of a prescription running against the owner of real estate in the absence of continuous and uninterrupted adverse possession on the part of the person in whose favor the prescription was running, or, indeed, run against him without at the same time and ipso facto running in favor of some one else, it would be hard to say. Certainly not from the civil law. The civil law books will be searched in vain for any such idea, save for the discussion already referred to as having arisen under article 2262 of the Code Napoléon. At common law such a prescription could not possibly run against the owner, for the fundamental principle there is that:

"One claiming land adversely must, in order that his claim may be effective as against the owner, be in actual possession thereof, for without such occupancy the law assumes the possession to be in the owner of the legal title." 1 R. C. L. p. 692.
"The constructive possession of land is always in the owner of the best title, unless he has renounced it, and this constructive possession can never be ousted by anything less than an actual possession maintained for the necessary period." 2 C. J. 53.

And see 2 C. J. 53, note 28, where the Supreme Court of Tennessee is quoted as follows:

"The inference that, because by the recent statute a mere claim of title, unaccompanied by adverse possession, gives a right of action against such claimant, the statute of limitations therefore attaches in his favor, by the mere force of such adverse claim, is utterly destitute of foundation in law."

This principle is embodied in article 3434 of our Code:

"Since the use of ownership is to have a thing in order to enjoy it and to dispose of it, and that it is only by possession that one can exercise this right, possession is therefore naturally linked to the ownership."

And where there are two constructive possessions, it is that of the best title which prevails; or, in other words, where there are two titles, possession follows the true title. Moore v. Morgan's La. R. R. Co., 126 La. 888, 53 South. 22.

The whole argument of defendant's learned counsel is founded upon the supposed ab-

sence of all qualification to the terms of article 3548. The argument is that "all actions," without qualification, with nothing said as to the necessity of adverse possession, are said by this article to be prescribed by 30 years, and that therefore this action in revendication is prescribed. The argument is founded upon the strict letter of the article. But the rigid letter of said article is to be tempered and qualified by the necessary general principles of prescription. Such, for instance, as those relating to imprescriptibility (for some actions are imprescriptible), interruption, suspension, etc.; and. we say, by the fundamental and necessary principle, that prescription cannot possibly either begin or continue to run in favor of a party out of possession or against one person without at the same time running in favor of some other person.

Needless to say that the idea of following the letter of said article unbendingly, as if said article stood, alone in our statutory law, is totally inadmissible. That article has to be read in connection with article 3457, which says of prescription that it is:

"A manner of acquiring the ownership of property, or discharging debts, by the effect of time, and under the conditions regulated by law."

Now, what are the condtions, "regulated by law," under which an owner of real estate may lose his title?

To our mind it is utterly and plainly unjuridical to say that an owner may lose his title without some one else ipso facto eo instanti acquiring it. A title cannot remain up in the air. One party losing his title, and another party acquiring it, or one party acquiring the title and another party losing it, are the necessary converses of each other. It follows from this that when the Code provides the mode, and the sole and exclusive mode, by which one party may acquire title by the prescription of 30 years,

it necessarily, ipso facto, provides the mode, and necessarily the sole and exclusive mode, by which the former owner may lose his title. When, therefore, articles 3499, 3500, and 3501 of the Code provide the exclusive mode in which a party may acquire title by the prescription of 30 years, they necessarily provide the exclusive mode by which a party may lose his title by the prescription of 30 years. Article 3548, which provides that the action for an immovable is prescribed by 30 years, or, in other words, that an owner loses his title by the prescription of 30 years, must therefore necessarily be read in connection with said article 3499 et seq. which provide how a party may acquire title by said prescription. The losing of the title beng the mere converse of the acquisition by some one else, the affirmative as to the only mode in which the title may be acquired by prescription of 30 years is pregnant with the affirmative of the only mode in which it may be lost.

But the Code does not leave us to mere inference in this matter, for by article 496, already quoted supra, it provides in express terms how an owner may lose his ownership:

"The owner exposes himself to the loss of his right of ownership if he permits it to remain in the possession of a third person for a time sufficient to enable the latter to acquire it by prescription."

This, we say, is pregnant with the negative that he cannot lose it unless he leaves it in the possession of a third party.

The contention of defendant adds to this article a provsion that the owner loses his ownership by prescription, even though he does not allow any one to remain in the possession of it "a sufficient time to enable the latter to acquire it by prescription."

True, the defendant has not said that the plaintiffs in this case have lost the title, and that the defendant has acquired it; but it

proposes to do what is the exact equivalent of that, to take the property away from the plaintiffs and give it to the defendant. If there is a difference between the two, we do not see it; and we are sure the litigants do not either.

The contention of defendant nullifies, throws into the scrap heap, a jurisprudence long firmly established in this state, and in the modern common law, and, we dare say, wherever title to real estate is allowed to be divested by prescription. It is the jurisprudence usually found under the heading Tacking of Possessions.

"*Tacking Possessions of Same Person Temporarily Interrupted.*—Since the constructive possession of the true owner revives when actual possession by the adverse claimant ceases, a renewed adverse possession by him after temporary abandonment cannot be tacked to his prior possession to make out the statutory period. Nor can one adverse holder tack together his own several holdings when he has allowed another person to acquire the intermediate tortuous possession before his own has ripened into title." 1 Cyc. 1009.

"Several successive possessions cannot be tacked for the purpose of showing a continuous adverse possession, where there is no privity of estate or connection of title between the several occupants. Entries of this character, neither of which continues for the limitation period, are merely a series of independent trespasses which cannot ripen into title, because the law restores the possession of the rightful owner on every discontinuance of the possession of one who holds adversely to him." 1 R. C. L. 720.

"*Between Whom Privity Exists.*—Privity denotes merely a succession of relationships to the same thing, whether created by deeds, or by other act, or by operation of law. If one by agreement surrenders his possession to another, and the acts of the parties are such that the two possessions actually connect, the latter commencing at or before the former ends, leaving no interval for the constructive possession of the true owner to intervene, such two possessions are blended into one, and the limitation period upon the right of such owner to reclaim the land is thereby continued; indeed that purpose of continuous possession is the continuous ouster of the owner." 1 R. C. L. 718.

It will suffice for us to quote from one decision by this court (Sibley v. Pierson, 125 La. 514, 51 South. 513):

"Defendants, on the other hand, say that the court erred in not according to their mother, and through her to them, the benefit of the possession of her vendor, their father, and in not, upon that basis, maintaining their plea of the prescription of 30 years. * * * There is no doubt that, where an heir (and the same may be said of a coproprietor, other than an heir) has possessed the whole or part of an estate separately for 30 years, he may successfully oppose a suit for partition. * * * But he must have possessed uninterruptedly and in the same character during the entire period; and where a person, having acquired a particular described tract of land, has taken possession of adjoining tract, or, having acquired a specific interest in a particular tract, has taken possession of the whole, with a view of acquiring the additional tract, or interest, merely by holding possession of it under a claim of ownership, he does not convey such possession to a vendee to whom he sells the tract or interest described, and such vendee cannot, for the purpose of aiding himself in the acquisition by prescription of property not included in his title, add his vendor's possession to his own, there being no privity between him and his vendor in that respect. Civ. Code, art. 3520; Prevost v. Johnson, 9 Mart. (O. S.) 170; City v. Shakespeare, 39 La. Ann. 1033, 3 South. 346; Railway Co. v. Le Rosen, 52 La. Ann. 204, 26 South. 854; Jasperson v. Scharnikow, 15 L. R. A. 1192, 1202 (notes); A. & E. Enc. of Law (2d Ed.) vol. 1, pp. 842, 845; Cyc. vol. 1, p. 1007."

The case of Railway Co. v. Le Rosen, 52 La. Ann. 204, 26 South. 854, here cited, is a well-known one in our reports. There, a lot in Shreveport had been possessed continuously and uninterruptedly under fence for more than 40 years, the successive possessors not suspecting that a certain part of the lot was not included in the description of the lot as contained in their successive titles. They pleaded in vain the prescription of 30 years. The court held that the possessions of the successive holders could not be tacked, for the reason, as expressed in the Sibley v. Pierson decision, supra, "there being no privity between him and his vendor in that respect." The law "restored the possession of the rightful owner on every discontinuance of the possession of one who holds adversely to him." 1 R. C. L. supra.

This jurisprudence, thus so well established, both in this state and at common law, is entirely inconsistent with the theory of de-

fendant, that for defeating the action of the owner of the property a continuous uninterrupted possession of 30 years is not required.

To our mind, the argument, in a nutshell, stands thus: A party cannot lose his title without at the same time some other party acquiring it. Until a party loses his title, or, which is the same thing, until some other party acquires it, there cannot possibly be any reason for not letting the title be judicially asserted. No one can pretend that ownership can be acquired by the prescription of 30 years without continuous, uninterrupted possession. Hence adverse possession during 30 years is necessary for depriving an owner of his right to assert his title judicially.

The fact is that, if this contention of adverse possession not being necessary for the prescription of an owner's right of action were not being urged seriously, we should not consider it to be serious. For how can prescription against a right of action run so long as there is no adverse party against which the action may be brought; and, moreover, so long as there is no cause or reason whatever why an action should be brought? An owner has a tract of swamp land which nobody is disturbing. If he wanted to bring suit against anybody about the land, he could not, there being no one disturbing the land. This situation of nobody disturbing the land, and of the consequent impossibility of bringing suit, continues for 30 years. On the first day of the thirty-first year some one disturbs the land, and the owner brings suit; and he is told that his right of action is prescribed. To contend a thing of that kind is to lose sight of the fact that before prescription can run against a cause of action the cause of action must exist. Prescription cannot run against a cause of action which does not exist; and a cause of action for the petitory action, or action in revendication does not exist until some party has taken adverse possession.

And this adverse possession must necessarily be continuous and uninterrupted in order that the prescription itself should not be interrupted, and a new course of prescription have to begin, for, by operation of the principle that, in the absence of adverse actual possession possession follows title, the possession of the owner of the title would revive the moment the actual possession ceased, and if actual possession were resumed after this interruption, this new actual possession could not be joined to the actual possession prior to the interruption for making out the sum of the prescriptive period. After every interruption, a new period of possession begins. C. C. art. 3495.

Defendant invokes also the prescription of 30 years provided for by article 1030 of the Code reading:

"The faculty of accepting or renouncing a succession becomes barred by the lapse of time required for the longest prescription of the rights to immovables."

This prescription is inapplicable to the case, for the reason that the plaintiffs accepted the succession of their ancestor through whom they derive title by inheritance within the 30 years.

But defendant contends that the said acceptance is inapplicable to, or did not cover, this particular property, because this property was not included in the inventory of the succession; that there was no acceptance in so far as this particular piece of property is concerned. Article 986 of the Code reads:

"He who has the power of accepting the entire succession cannot divide and accept only a part."

The plaintiffs had the power of accepting the entire succession of their ancestor, since they were the legal heirs. In attributing to them the acceptance of only a part of the said succession, the defendant supposes their having done something they were without power to do.

By not accepting the succession within 30

years the heir loses his inheritance, and the heir next in rank becomes vested with the right of inheritance; and this happens even though this heir next in rank has not been in possession of the property of which the succession is composed. Defendant points to this as illustrative of the possibility of an owner losing his property by the prescription of 30 years without possession on the part of the person to whom he loses it. The inappropriateness of the illustration lies in the fact that, under the express terms of said article, what is barred by the prescription which it provides is not the right of an owner to recover his property, but, in the words of the article, "the faculty of accepting a succession." Between the two cases there is no analogy whatever. The heir has 30 years within which he may elect to accept, and thereby acquire the property. Pending this 30 years thus running against him the property is not in his possession, either actually or constructively, but in the possession of the representative of the succession; and this representative of the succession does not hold for himself, but for whichever heir may eventually accept the succession, so that when the heir first in rank suffers his faculty to accept to prescribe, and the heir next in rank accepts, the latter heir has in fact possessed through the representative of the succession from the time of the opening of the succession. "The effect of the acceptance goes back to the day of the opening of the succession." C. C. 957. The rationale of said article 1030 is that the public has an interest in not letting the ownership of property remain too long in uncertainty or suspense; and hence a time is fixed within which the heir must make up his mind whether to accept or renounce, and thereby fix the ownership of the property. How totally inapplicable this is to the case of an owner losing his ownership because he has had no occasion to use it for a certain length of time is perfectly evident. We may add that no article in the French Code or in ours has been found to be more difficult of interpretation than this article 1030. The French writers have evolved no less than eight different systems, or theories, out of it; and the justices of this court, in the Succession of Waters, 12 La. Ann. 97, frankly confessed their inability to solve it. Therefore to invoke it for throwing light upon the proper interpretation of some other article of the Code is simply to seek light out of Cimmerian darkness.

The plaintiffs are Dominique Harang and Mrs. Wid. Eugene F. Meunier, each claiming to own $2230/25920$ of one-third undivided of the property in question, a full description of which is given in the judgment appealed from.

The painstaking care with which the learned trial judge has gone into the intricate facts of this case, and the elaborate and lucid opinion he has written, have conduced very much to facilitate the work of the court, and has made unnecessary the going into greater detail than has been done in this opinion. It would have been practically a mere repetition. He found as we do in favor of plaintiffs.

Judgment affirmed.

MONROE, C. J., dissents and reserves right to hand down opinion. See 79 South. 789.

O'NIELL and LECHE, JJ., concur in the decree.