See, also, Delogny v. Rentoul, 2 Mart. (O. S.) 175; Agricultural Bank v. The Jane, 19 La. 1.

In 1 Wigmore's Greenleaf on Evidence (16th Ed.) § 192, we find the following statement of the principle:

"But if the admission be of a collateral or independent fact, such as the handwriting of a party, capable of easy proof by other means, and not connected with the merits of the case, it is receivable though made under a pending treaty. It is the condition, tacit or express, that no advantage shall be taken of the admission, it being made with a view to, and in furtherance of, an amicable adjustment, that operates to exclude it. But, if it is an independent admission of fact, merely because it is a fact, it will be received; and even an offer of a sum by way of compromise of a claim tacitly admitted is receivable, unless accompanied with a caution that the offer is confidential."

To the same effect, see 22 C. J. verbo Evidence, § 349.

For these reasons we see no error in the judgment appealed from, and it is accordingly affirmed.

Judgment affirmed.

----

**(98 South. 760)**

No. 25462.

## HARANG et al. v. GHEENS REALTY CO. et al.

(Oct. 16, 1923. Rehearing Denied by Whole Court Jan. 7, 1924.)

*(Syllabus by Editorial Staff.)*

1. **Taxation** ⊂⇒776—**Tax deeds and other deeds in chain of title held not to embrace lands sought to be recovered.**

In a suit to recover realty, deeds in defendant's chain of title, including tax deeds, *held* not to embrace the lands in controversy.

2. **Auctions and auctioneers ⬡➔6—For adjudication after sale to vest title, auctioneer must have written authority.**

While title vests in the adjudicatee by adjudication by an auctioneer, and no deed is necessary, in view of Civ. Code, arts. 2608, 2623, it is necessary that the auctioneer have written authority to offer the property at auction, in view of article 2060, and hence an owner was not divested of title by an adjudication following an auction sale of property to satisfy his creditors, where it did not appear that the auctioneer had written authority to offer the property at auction.

3. **Auctions and auctioneers ⬡➔6—Recitals in notarial act and in deed held not sufficient to show auctioneer's written authority in absence of acceptance of title by purchaser.**

Where an owner of property agreed to sell it and distribute the proceeds for the benefit of his creditors, and the property was sold at auction, and part of the proceeds distributed, recitals in the notarial act of distribution and in a deed to part of the land that the debtor caused his property to be offered at auction, *held* insufficient as written evidence of the auctioneer's authority to offer another part, in absence of a showing that claimed purchaser had accepted title, he not even being a party to such instruments.

4. **Taxation ⬡➔805(2)—Three-year prescription held insufficient to support title under tax sale.**

The 3-year prescription provided by Const. 1898, art. 233, *held* insufficient to support title under a tax sale, where it did not appear that the property in controversy was embraced in such sale.

5. **Taxation ⬡➔803—Prescriptions under act relating to forfeitures held inapplicable to tax sale.**

The 3-year prescription provided by Act No. 185 of 1904, is applicable only to sales based on a forfeiture, or which convey or purport to convey an interest or title to property acquired or pretended to have been acquired by the state, or one of its political subdivisions by such means, whether the property be actually forfeited or not, and cannot be employed in support of title not based upon a forfeiture, but on sale of land for taxes due thereon, confirmed by the auditor of public accounts by issuance of deed, under Act No. 47 of 1873, § 6.

6. **Adverse possession ⬡➔22—Prescription; grazing cattle on uninclosed land insufficient to support 30-year prescription; "actual possession."**

Possession of uninclosed land, consisting merely in permitting cattle to graze thereon, where the cattle of others also had access to the land, *held* not "actual possession" within the 30-year prescription, under Civ. Code, arts. 3499 et seq. and 3493.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Actual Possession.]

7. **Adverse possession ⬡➔71(1)—Prescription; to acquire title under 10-year period of prescription the holding must be under title transferring property.**

One who does not hold under a title that transfers the property cannot acquire title thereto under the 10-year period of prescription, provided for by Civ. Code, arts. 3479, 3482, 3487.

8. **Real actions ⬡➔8(2)—Petitory action; when occupancy in bad faith must be shown to recover rent prior to institution of suit for realty stated.**

Where claimants of property also claimed rents for occupying the property prior to institution of suit, it was incumbent on claimants to prove that the occupant was a possessor in bad faith, under Civ. Code, arts. 502, 3453.

9. **Real actions ⬡➔8(4)—Petitory action; occupant having knowledge of plaintiff's claims held a possessor in bad faith.**

As in a suit to recover realty and rents prior to institution of suit, the question is whether the occupancy was in good or bad faith, the fact that the occupant had knowledge of plaintiff's claims obtained from a suit in which no notice of lis pendens was filed, *held* sufficient to show bad faith, although he was not a party to the suit, in view of Act No. 22 of 1904, and Civ. Code, art. 503.

10. **Real actions ⬡➔8(4)—Petitory action; claimants of property held entitled to fair rental value of property.**

Where, in a suit to recover realty, plaintiffs sued for rents and not for the actual fruits produced by the property, they were entitled to a judgment equal to the fair rental value of the property.

Appeal from Twentieth Judicial District Court, Parish of Lafourche; H. M. Wallis, Jr., Judge.

Suit by Dominique Harang and others against the Gheens Realty Company and others. Judgment for plaintiffs, and defendants appeal. Modified and affirmed.

Alexis Brian, of New Orleans, for appellants.

D. V. Doussan, of New Orleans, for appellees.

By the WHOLE COURT.

OVERTON, J. The purpose of this suit is to recover a large tract of land situated in the parish of Lafourche, about 28 or 30 miles below Thibodeaux, bounded on one side, or on the south, by a line drawn parallel to Bayou Lafourche, at a distance of 40 arpents therefrom, and commonly designated as the "40-arpent line" or the "lands of Lafourche"; on one side, or on the west, by Bayou Chete Tamalia, now known as Bayou Vacherie, which separates it from the plantation now or lately owned by Charles Derbigny, and by lot 46 of the Bougerol plan; and on the north and east by a line commencing on the north side of the willows, which are to be found at the shell bank on Bayou Vacherie, which line runs to the 40-arpent line, passing between the Chactos and Petit Bois; and is delineated on a map of "Vacherie Charbonnet," by A. F. Rightor, deputy surveyor, as commencing on the 40-arpent line, at a distance of 63 chains from Harang Canal, and running north 9 degrees west, until it strikes Bayou Vacherie; all according to a plat of survey made by Frank H. Waddill, civil engineer and surveyor. The purpose of this suit is also to recover judgment against defendants for rents and revenues, or the rental value of a large portion of said land, from June 6, 1914 to April 8, 1919, alleged to amount to $16,776.50.

Mrs. Louis Charbonnet, in the latter part of the year 1812, was indisputably the owner of all of the above-described land. Plaintiffs allege that Mrs. Louis Charbonnet and her husband, by deed under private signature executed in 1813, sold the above land in the proportion of one-third each to three brothers, Jacques Philippe Enoul Dugue Livaudais, Francois Joseph Enoul Dugue Livaudais, and Charles Enoul Dugue Livaudais. The description under which the land was sold by Mrs. Charbonnet is as follows:

"All of my rights in the portion of land situated between the Bayou de la Vacherie, the lands of the Lafourche, and a line which should start from the bank of the Bayou de la Vacherie, on the other side of the willows that are found at the end of the levee of shells bordering on the said bayou, and pass between the Petit Bois and the Chactos."

Plaintiff also contends that one of the Livaudais brothers, to wit, Jacques Philippe, sold his undivided third interest in said property in January, 1820, to his brothers Charles and Francois; and that Charles and Francois in February, 1828, sold an undivided third interest in the whole of the property to Louis Harang; and that Charles thereafter sold his remaining undivided interest in the whole of said property to his brother, Francois, the result of which transfers was to vest an undivided two-thirds interest in said property in Francois Joseph Enoul Dugue Livaudais and an undivided third interest in Louis Harang.

Some of the plaintiffs herein are the heirs and descendants of Louis Harang, and some are the heirs and descendants of Francois Joseph Enoul Dugue Livaudais. Those who are the heirs and descendants of the former claim an undivided one-third interest in the land in controversy, and those who are the heirs and descendants of the latter claim an undivided two-thirds interest therein.

The defendants deny that plaintiffs are the owners of the land sued for, and aver that one of them, the Gheens Realty Company, is the owner, and has actual possession of all of that part of it lying back of

what is known as the 80-arpent line, but assert no claim of ownership or possession to that part of it lying between the 40 and 80 arpent lines. That company is the only defendant that has appealed from the judgment rendered. It makes the averment that it holds title by a regular chain of conveyances from Oscar Lepine, who, it is averred, acquired title from the state of Louisiana, which, in turn, acquired title by purchase at tax sale under assessments made in the name of Le Beau and Charbonnet for taxes for the years 1870, 1871, and 1872; and that, after Lepine had acquired the state's tax title, he obtained deeds to the property from the succession of A. B. Charbonnet, who was one of the tax debtors, and from the heirs of Louis J. Le Beau, who was the other; and it is averred, in effect, that Le Beau and Charbonnet held title by regular chain from Mrs. Louis Charbonnet, the person to whom plaintiffs trace.

In the tax deed relied upon by the Gheens Realty Company the land conveyed is described as follows:

"A certain tract of land situated in the parish of Lafourche, interior, lying back of the sugar plantation belonging to the Consolidated Association of Planters in the settlement known as the Vacherie Dugue Livaudais, and designated on the map of the parish of Lafourche as a part of the B. Florian claim, and containing fraction of townships 15 and 16 southeastern district, range 18 or 19 east. The number of acres unknown, but according to the assessment rolls the tract of land above described and sold is supposed to embrace an area of about 20,000 acres, being the property of Le Beau and Charbonnet, as per assessment roll of the state of the years 1871 and 1872, to satisfy a debt due said state for the unpaid taxes of 1871 and 1872."

In the last link of the chain of title upon which the Gheens Realty Company relies, which consists of a sheriff's sale made in 1914 to John R. Gheens, who purchased for that company, as he later acknowledged by written act, the land conveyed is described as follows:

"A certain tract of land known as the Vacherie Charbonnet, comprising 20,016 arpents and $58/100$ of an acre in superfices, more or less, and bounded by the Bayou de la Vacherie, which separates it from the plantation, now or late of Charles Derbigny, and which is navigable as far as Lake Ouacha or Barataria, by Bayou Catahoula, and by lands now or lately belonging to Enoul Dugue Livaudais, the whole according to a plan of A. H. Rightor, D'y Surveyor."

This description is used, not only in the deed under which the Gheens Realty Company asserts title, but, omitting the tax deed, also practically word for word, in all deeds under which that company claims, with the exceptions that where the boundary in the above description and that contained in some of the remaining deeds reads: "By property now or lately belonging to Enoul Dugue Livaudais." In one deed it reads: "By lands of Ernest Dugue Livaudais," and in other instances as lands of Messrs. Enoul Dugue Livaudais. To the above exceptions there is another, occurring in some of the deeds passed comparatively recently, which will be noticed in passing on the plea of prescription of 10 years urged by defendants, as it is of no importance in any other connection.

Some of the chief questions to be determined in this case were before us in the cases of Harang v. Golden Ranch Land & Drainage Co., 143 La. 982, 79 South. 768; Harang v. Bowie Lumber Co., Ltd., 145 La. 96, 81 South. 769; and Bendernagel v. Foret, 145 La. 115, 81 South. 869.

In the Harang Case, reported in 143 La. at page 982, 79 South. 768, a sketch will be found showing the land in controversy. In that case, two of the present plaintiffs, asserting title as heirs of Louis Harang, sued for their undivided interest in the land now in contest, and it was held that they had proven their title, and judgment was rend-

ered in their favor accordingly. However, as they failed to file and record a notice of lis pendens, and as it was contended that the land in controversy was sold, pending the litigation, to one of the present defendants, the Gheens Realty Company, those plaintiffs were forced to institute the present suit, in which they were joined by their coheirs and by the heirs of Francois Joseph Enoul Dugue Livaudais.

In the Harang Case referred to in the preceding paragraph, it was necessary to decide whether the tax sale, above mentioned, upon which the Gheens Realty Company partly relies, included the land, which was in controversy in that suit, and which is in controversy in the present one, and it was held that it did not. As to why it did not include the property then and now in dispute, it was pointed out, among other reasons, that the description in the tax deed places the property in different townships, and ranges from the property in contest, and locates it in the Vacherie Livaudais, when the property in litigation is in the Vacherie Charbonnet. It may be said, in addition, which that decision also points out, that the tax debtors, Le Beau and Charbonnet did not own at any time the land in controversy; and hence that no ground existed for holding that the land conveyed, or sought to be conveyed, by the tax sale, embraced the land in dispute. It was also held in that case that the deeds which Lepine obtained from the tax debtors, or their representatives and heirs, did not embrace the property in controversy, nor did the deeds from those from whom Lepine's vendors purchased embrace it, including the deeds executed by the heirs of Mrs. Louis Charbonnet.

In the case of Harang v. Bowie Lumber Co., cited supra, which was a suit for the value of timber cut and removed from a tract adjoining the land in dispute, this court, in passing on the title advanced by the plaintiffs therein, which is the same chain of title as the one relied on by the plaintiffs in this case, found that in 1812 Mrs. Louis Charbonnet, through whom the present plaintiffs claim, and to whom the defendants herein seek to trace, acquired in 1812 a large tract of land lying on both sides of the line, running north 9 degrees west, and shown on the plat attached to the opinion of this court in the Harang Case, cited supra, which tract extended from Bayou Vacherie to the 40-arpent line delineated on the sketch to which reference has just been made. It was also found, in accordance with plaintiffs' contentions herein, that Mrs. Charbonnet sold to the three Livaudais brothers in 1813 that part of the land acquired by her lying west of the line running north 9 degrees west, which includes the land here in controversy; and it was further found that, after Mrs. Charbonnet had made that sale, there remained as belonging to her, which she retained until death, all of the land which she acquired in 1812 lying east of the line, running north 9 degrees west. The court further found that after her death transfers were made of that part of the property, lying east of the above line, until all of it was acquired by Lepine. The court then, in passing upon the chain of title relied upon by defendants, which, as we have observed, is the same as that relied upon in this case, said, in reference to the sales constituting that chain, that "none of the deeds from the transfers by the heirs of Mrs. Charbonnet, down to and including the tax sale or auditor's deed to Oscar Lepine, conveyed or described the land now in dispute, or the tract that was in contest in the Golden Ranch Case;" and, as reasons why they did not, said that those lands, referring to the lands involved in that case, and in the Golden Ranch Case, "were plainly excluded by the declaration in the deeds that the land conveyed was bounded by the land

of the Messrs. Livaudais, and by a declaration that the description was according to a plan of survey made by A. H. Rightor, deputy surveyor; which survey showed that the line bearing north 9 degrees west separated the land conveyed to Oscar Lepine from the tract previously sold by Mrs. Charbonnet to the three Livaudais brothers."

As the land sold to the three Livaudais brothers by Mrs. Charbonnet includes the land here in controversy, and, as the tract that was in contest in the Golden Ranch Case was the same as that actually in contest in this case, it follows that the above is a distinct holding that the deeds constituting the chain of title relied upon by the defendant herein, the Gheens Realty Company, do not embrace the land in dispute, down to and including the deeds to Lepine.

The Gheens Realty Company does not question that the ruling in the above cases is to that effect, but takes the position that the court erred in so ruling, not only in that case, but also in the Golden Ranch Case, above referred to, and likewise in the case of Bendernagel v. Foret, cited supra, in which a similar ruling was made. We have again carefully examined the evidence, and have reached the same conclusion as was reached in those cases; that is, that the deeds upon which the Gheens Realty Company relies, down to and including those to Lepine, do not embrace the land in dispute, or any lying west of the line bearing north 9 degrees west, and that the land in dispute is excluded by giving as one of the boundaries the lands belonging, or lately belonging, to Messrs. Enoul Dugue Livaudais, or to simply Enoul Dugue Livaudais, and by referring to the Rightor plat for the purpose of showing the property conveyed.

The effect of the above ruling is that the western boundary of the land conveyed in the deeds relied on by the Gheens Realty Company, down to and including those to Lepine, is the land actually in dispute in this case, together with that lying south of it between the 40 and 80 arpent lines, and between lot 46 of the Bougerol plan and the line bearing north 9 degrees west.

The Gheens Realty Company, however, contends that it is error to so rule, and takes the position that Francois Livaudais and one of his brothers owned land to the south and west of the land called for in the deeds to Lepine containing a front of 40 arpents on Bayou Lafourche, and that Francois Livaudais also owned lot 46 of the Bougerol plan, which lot is shown on the plat attached to the opinion in the Golden Ranch Case, and that the designation of one of the boundaries in the deeds under which it claims as lands belonging to the Messrs. Enoul Dugue Livaudais, or simply to Enoul Dugue Livaudais, refers to those lands, and not to the lands acquired by the Messrs. Livaudais from Mrs. Charbonnet in 1813.

In so far as concerns the tract fronting 40 arpents on Bayou Lafourche, it will be seen, by reference to the plat, mentioned above, that, since it is contended that Lepine's deeds, and the deeds of those from whom he claimed, called for land down to the 40-arpent line, the tract fronting 40 arpents on Bayou Lafourche might serve as a small part of the southern boundary, but can be of no assistance in determining the western boundary, which is the vital one, and was manifestly not intended to be so used. In so far as concerns lot 46 of the Bougerol plan, a part of it, at least, was once owned by the three Livaudais brothers, and the part thus owned was acquired by one of them, Francois, in 1840. While that lot would fix in connection with Bayou Vacherie the western boundary of the land acquired by Lepine in accordance with the contention of the Gheens Realty Company, yet, as the Livaudais brothers once owned

all of the land between lot 46 and the line bearing north 9 degrees west, and, as later, one of them, Francois, owned a two-thirds undivided interest therein, it is hardly likely that Lepine's vendors, or those under whom they held and their vendees, had they intended the lands owned, or once owned by the Livaudais brothers, or one of them, in lot 46, as the western boundary, would have described that boundary as lands now or lately belonging to Messrs. Enoul Dugue Livaudais, or simply to Enoul Dugue Livaudais, as that would have thrown land owned, or once owned, by the Livaudais brothers, or one of them, between the eastern and western boundaries, and would have resulted in defeating the intentions of Lepine and his vendors and those from whom the latter held, or at least in making the lands in lot 46 as the western boundary extremely uncertain.

It is contended, however, by the Gheens Realty Company that, unless the western boundary be deemed the lands in lot 46 and a part of the Bayou Vacherie, and not the lands lying between them and the line running north 9 degrees west, the acreage stated in the deeds to Lepine and his authors in describing the land would fall far short, and that these boundaries are necessary to give the required acreage. However, be that as it may, the sales to Lepine (except the tax sale, which for other reasons, stated above, does not include the property in dispute) all conclude the description of the property conveyed by them, as do also the deeds to Lepine's vendors, and their authors, from the time of the succession sale, in the succession of Mrs. Plicque, down to and including Lepine, as being in accordance with a plan drawn by A. H. Rightor, deputy surveyor. This reference is controlling in the description, and makes the boundaries of the land conveyed by those deeds clear. Since, therefore, the reference is controlling,

any mistake, whether made by the engineer, in calculating and determining the acreage, or by any one else, must yield to it. In fact, this reference not only destroys the force of any argument based on a discrepancy in acreage, but also makes it clear that the reference to the western boundary, as lands now or lately belonging to Enoul Dugue Livaudais, or to Messrs. Enoul Dugue Livaudais, relates to the lands lying immediately west of the line, bearing north 9 degrees west, and not to those in lot 46 of the Bougerol plan.

The argument is made, however, that the reference to the Rightor plat is not to the particular Rightor plat relied on by plaintiffs to show that the land described in the deeds of the Gheens Realty Company is not the land in dispute, but that the reference is to another plat, an official one, made by Rightor. However, it is sufficient to say that the evidence to the contrary is convincing. In fact, the official plat, which includes much more land than that entering into this controversy, is not adapted in the least to such a reference, and would not answer the purpose of the reference from any standpoint.

The Gheens Realty Company, however, contends that there are two deeds that show conclusively that the sales above referred to, under which it claims, embrace the land in dispute. These two deeds are one to Charles R. Ash, of date October 25, 1906, executed by the Golden Ranch Sugar & Cattle Company, and the other by Ash to R. H. Downman, also of date October 25, 1906.

By the first-mentioned deed, the Golden Ranch Sugar & Cattle Company conveyed to Ash the Derbigny plantation, which is not involved in this litigation, and also standing timber, including that on the land in litigation. By the second deed, Ash conveyed to Downman all of the timber on the Derbigny plantation and on the land in dispute. Both deeds in conveying the timber describe

the land in controversy, upon which a part of the timber was standing, substantially in accordance with the description contained in the deeds to Lepine and those from whom he claimed, other than the tax sale. While reference is made to the Rightor plat in the deed to Ash, and in the one by Ash to Downman, yet, for greater certainty, reference is also made to a plat compiled by a firm of engineers in 1906, which reference is so specific as to make it certain that a part of the timber conveyed, notwithstanding the rest of the description, was on the land in controversy. In other words, the description used in all of the deeds before the present description was adopted was so modified by the controlling reference to the second plat as to make it appear as if the description before used embraced the land in controversy. Manifestly, however, if we appreciate the contention of the Gheens Realty Company correctly, the changing of the description, for the purpose of the timber deed, from that used in preceding sales cannot have the effect of making those sales, including the tax sale, embrace the land in dispute. The only effect of the change was to place the Golden Ranch Sugar & Cattle company in the position of selling timber that did not belong to it, however positive that company may have been that it was the owner of that particular timber.

But the Gheens Realty Company does not rest here. It contends also that it has been adjudged, in so far as concerns the tax sale, above referred to, that that sale embraces the land in controversy. This contention is based on a proceeding instituted by the Golden Ranch Sugar & Cattle Company in 1910 to confirm tax titles to several distinct tracts of land sold for taxes due by various tax debtors. Among the titles presented for confirmation was the one acquired by Lepine. Not because of the tax title acquired by Lepine, but because of an entirely different tax sale of a different tract of land, which tract had been assessed and sold in the name of F. J. E. D. Livaudais, the latter was made a party to the suit to confirm, and, in the event that he should be dead, his heirs were made parties and a curator ad hoc was appointed to represent them. Neither Louis Harang nor his heirs were made parties to the proceeding, evidently for the reason that no sale of property, that was sold for taxes due by them, was sought to be confirmed. The contention is made, however, at least, in so far as concerns the heirs of Livaudais, if not also the heirs of Harang, that it was adjudged in that proceeding that the land that was sold for taxes, and acquired by Lepine, was the land in controversy. This contention is based on the mistaken position that the petition for confirmation and the judgment of confirmation describe the land conveyed by the tax sale by the same description as that used in the sale to Ash and from Ash to Downman, when as a matter of fact neither the petition nor the judgment used that description, but, instead, each adopts the description used in the deeds to Lepine, other than that in the tax sale itself, both of which descriptions we have held do not embrace the land in dispute. It may be observed also that no attempt was even made to obtain a decree to the effect that the land conveyed by the tax sale is the land here in controversy. It is therefore sufficient to say that, as no such issue was passed upon or even tendered, it cannot be said that it was adjudged in that proceeding that the tax sale embraced the property in contest.

[1] For the foregoing reasons we conclude that the deeds relied on by the defendant, the Gheens Realty Company, in the chain of title declared upon by it from the time of Mrs. Louis Charbonnet down to and including the deeds to Lepine, do not embrace the lands in controversy in this case, and

hence that company has shown no title by deed. On the other hand, in our opinion plaintiffs have established their chain of title to the property in question, down to their respective ancestors, Louis Harang and Francois Joseph Enoul Dugue Livaudais, from whom they claim by inheritance, and are entitled to judgment, unless the Gheens Realty Company has acquired title by prescription, that company not having title otherwise, or unless title has passed from plaintiffs or their ancestors in some other manner.

In so far as concerns the descendants and heirs of Louis Harang, if they have lost title, it is only by prescription, but, in so far as concerns those of Livaudais, it is contended that their ancestor, from whom they claim by inheritance, parted with his interest in the land years ago, and hence that his descendants and heirs have no interest in prosecuting this suit, and have no right to eject the Gheens Realty Company from the property, possession of which it has admittedly acquired. This plea is made in addition to the pleas of prescription urged against those heirs, and is made in the alternative, in the event it should be found that the Gheens Realty Company has no valid title to the property by prescription or otherwise.

The plea is based on several documents found in the record, which are brought up as parts of bills of exceptions. The first of these documents is a mortgage. In it, the ancestor of the Livaudais heirs, F. J. E. D. Livaudais, acknowledged that he was indebted to certain named persons, firms, and corporations, who apparently constituted all of his creditors, in sums aggregating $54,707.43. In order to secure the payment of this indebtedness, Livaudais, by this instrument, mortgaged in favor of his creditors, his slaves, various tracts of land, and his interest in other lands, among which was his two-thirds undivided interest in the property in question. These properties apparently amounted to all of his real estate and slaves. In this mortgage, Livaudais also bound himself to sell the property mortgaged, at either private sale or public auction, on terms of one-tenth cash, the balance payable in 1, 2, 3, and 4 years, the purchasers to give their notes, for the deferred payments, secured by indorsement, and also by mortgage on the property purchased. Livaudais further bound himself by this act to distribute the proceeds of the sale among the creditors named therein; and the creditors, on their part, bound themselves to release from the mortgage any of the property hypothecated that might be sold pursuant to the agreement contained in the act, to the end that a clear title might be given to the various purchasers; and the creditors also bound themselves to release Livaudais from all of his obligations to them upon his distributing the proceeds of the sale among them.

The second instrument relied upon by the Gheens Realty Company to show that Livaudais had parted with his portion of the land in controversy, and therefore that his heirs have no interest in prosecuting this suit, is a procès verbal of sales of property, made at public auction by P. E. Tricou, auctioneer, on December 1, 1845. This instrument, which was executed and signed by the auctioneer three days after the sale, recites that this official acting upon the order, and for the account, of F. J. E. D. Livaudais offered at public sale certain described property, being the same property as that described in the mortgage. The instrument then recites the terms and conditions of the sale, which are the same as those stated in the mortgage. Following this recital, notice is given that the acts of sale will be passed before Theodore Guyol, notary public, at the expense of the purchasers; and further notice is given that the purchasers will be required to comply with the conditions of the sale within 15 days following the adjudications, and then follows a de-

scription of each piece of property offered and adjudicated, among which is the property in question, which appears to have been bid in by L. Pilcher for the account of N. Stewart for $810. This procès verbal was attached to an act of sale conveying property other than that in litigation, executed by Livaudais in favor of Lefevre, one of the purchasers at the auction.

The third document offered to show a lack of interest in the Livaudais heirs to prosecute this suit is a receipt, signed by the auctioneer, for his commissions in full, and the fourth is a release of the mortgage granted by Livaudais to his creditors, and executed some two months after the auction sale. The fifth document relied on, for the purpose above stated, acknowledges that Livaudais, who signed the instrument with his creditors, had surrendered and abandoned to the latter all of his property, and had caused it to be sold on December 1, 1845; and the document recites that the proceeds of the sale, consisting of money and notes, were ready for distribution with the exception of the proceeds of some of the real estate sold on the above date, the purchasers of which had not, up to that time, which was exactly a year and a day after the sale, complied with the terms of the adjudications. The document then shows the distribution made, and shows that the creditors released Livaudais from his obligations to them, subject to the reservation, however, that the proceeds of the property, the title to which had not then been accepted by the purchasers, would immediately after the completion of the sales thereof, form the subject of another distribution.

One of the contentions of learned counsel for the defendants is that the documents above mentioned show that Livaudais gave the property in litigation to his creditors in payment of the debts due by him to them, and thereby divested himself of title. One of the documents under consideration—the act showing the distribution of the proceeds of the auction sale—in its preamble, as we have observed, refers to a giving by Livaudais of his property in settlement of his debts, but this part of the act merely undertakes to recite what had taken place, and unmistakably refers to the agreement entered into between Livaudais and his creditors contained in the act of mortgage granted by him to them. There is nothing else to which it could refer. This agreement, which is clear and unambiguous, should be looked to for the purpose of ascertaining what was done in this connection. Referring to it, we find nothing in it that even suggests a giving in payment or dation en paiement. All that Livaudais then did was to acknowledge that he was indebted to his creditors in certain named amounts; to mortgage his property in their favor to secure the payment of those amounts; to bind himself to sell the property mortgaged within a specified time; and to distribute the proceeds of the sale among his creditors. This action, and what followed, as narrated above, are utterly inconsistent with a giving in payment, and show that none was made or intended, and that, instead, the intention was that Livaudais should retain title to the property until it was sold.

Learned counsel for defendants, however, relies chiefly on the adjudication to L. Pilcher for the account of N. Stewart to show that Livaudais parted with his interest in the property in litigation. Counsel recognizes that the procès verbal of the auction sale shows that it was contemplated that deeds would be executed before a notary public in favor of those purchasing at the sale, and that he has been unable to produce such a deed, but argues that its production is unnecessary, since the adjudication is of itself sufficient to vest title in the purchaser.

[2] It is true, as stated by counsel, that title vests in the adjudicatee by the adjudication, and that no deed is necessary to make

it so vest. C. C. arts. 2608, 2623; Succession of Massey, 46 La. Ann. 126, 15 South. 6; Smith v. Krause & Managan Lumber Co., Ltd., 125 La. 703, 51 South. 693. However, for the adjudication to vest title in the adjudicatee, it is necessary that the auctioneer have written authority to offer the property at auction. If no such authority is given him, the title does not pass by the adjudication. C. C. art. 2606; Cronan v. Succession of McDonogh, 12 La. Ann. 269; Reinach v. Jung, 122 La. 612, 48 South. 124. In the case at bar, it does not appear that the auctioneer was authorized by Livaudais or by any one else, having the required power to offer the property at auction. The only reference to authority is the recital in the procès verbal that the sale was made by order of Livaudais and for his account, but it does not appear that the order was a written one. Hence, as it does not appear that the auctioneer had written authority to offer the property when he made the sale, title did not pass to the adjudicatee by the adjudication.

[3] It might be argued, however, that as, in the notarial act signed by Livaudais and his creditors, showing the distribution of the proceeds of the sale made (being the proceeds derived from those who had accepted title to the property purchased by them, and who had complied with their bids), there are recitals showing that Livaudais caused his property to be offered at auction, as provided in the agreement contained in the mortgage, and that since Livaudais signed the act of distribution, this furnished written evidence of the auctioneer's authority, and was all that was necessary to complete the sale. To these recitals, in the act of distribution, there also might be added the fact that in executing the deed to Lefevre, conveying property, other than that in litigation, bought at the auction sale, Livaudais made similar recitals, and it might be also argued that Livaudais thereby furnished written evidence of his having authorized the auctioneer to offer, at auction, the property in litigation; and that this was sufficient to cause title to pass.

However, as title does not pass when the auctioneer has no written authority to sell, recitals made in instruments to which the adjudicatee was not even a party, made in one instance 60 days after the adjudication, and in another a full year thereafter, are insufficient to cause title to pass, unless it appears that the adjudicatee, notwithstanding the defect in the adjudication, accepted title, in which event, as a matter of course, he would have the right to avail himself of the recitals in order to protect his title. But he is not bound to accept title under such circumstances, either before or after the acknowledgment. This was, in effect, held in the case of Reinach v. Jung, 122 La. 612, 48 South. 124, cited supra, wherein it was ruled that, notwithstanding the owner, who had offered a part of his real estate at auction, but without giving the auctioneer written authority to sell, could not force the adjudicatee to comply with his bid by tendering him written title. If it were otherwise, as was substantially observed in the case cited, it would leave it optional with the owner to confirm the sale or not, as he might see proper; and, if he chose to confirm it, to bind the adjudicatee whether he chose to be bound or not.

If, therefore, it does not appear that Stewart acted on the faith of the adjudication, and thereby accepted title, either before or after the above acknowledgments were made, it seems clear that the heirs of Livaudais may avail themselves of that fact in order to show that the property did not pass from their ancestor by the auction and by the subsequent acknowledgments, but that the title remained in him, and passed to them by inheritance, and especially is this so when the adjudication is presented by a third person who does not claim under it, and is urged by

such person in order to defeat a petitory action.

It does not appear that Stewart ever acted on the faith of the adjudication, and thereby accepted title, either before or after the acknowledgments were made. There is not the least sign, of the exercise of any right of ownership over the property by him or his heirs during the long period of nearly three-quarters of a century that elapsed between the auction and the trial of this case below. It does not even appear that Stewart complied in whole or in part, with his bid, and, therefore, by complying with it, that he must have accepted title. There is nothing in the receipt issued by the auctioneer to Livaudais for his commission for making the auction sale, or in the release granted by the creditors to Livaudais from the mortgage in their favor, or in the recitals contained in the act showing the distribution of the proceeds of the auction sale derived from those of the purchasers who had complied with their bids, that shows that Stewart had either complied with his, or had done anything, in any manner, showing an acceptance of title, assuming that these documents are admissible for that purpose. While the receipt shows that the auctioneer was paid in full by Livaudais on all adjudications made by him, and while the release granted by the creditors shows that the mortgage was released on all of the property, yet when these documents are read in connection with the recital in the act of distribution, showing that some of the purchasers had not complied with their bids and accepted title, it at once becomes apparent that the auctioneer was paid, and that the release from the mortgage was granted, without reference to whether all of the purchasers had complied with their bids and accepted title or not; and therefore no inference can be drawn from those documents that Stewart must' have complied with his bid and accepted title, on the theory that, if he had not, the payment would not have been made the auctioneer, or the release granted from the mortgage, or upon any other theory. In so far as concerns the act of distribution, it does not appear from it, who, among the purchasers, complied with his bid, and who did not. The act shows, as a whole, that the creditors had for distribution, in cash and notes, as the proceeds of the auction, considerably less than the total amount of the adjudications. It does not show, as contended by counsel, that the total amount of cash for distribution exceeded the cash portion of the purchase price required by the terms of the auction. To the contrary, it shows that less than that portion was received. •

We therefore conclude that it does not appear that the title to the two-thirds undivided interest in the land in controversy owned by Livaudais is vested in Stewart or his heirs, but, instead, we conclude that the title thereto is vested in the heirs of Livaudais, unless they have lost it by prescription.

The next issues to be determined are those raised by the prescription of three years, pleaded in support of the tax sale, under article 233 of the Constitution of 1898; the prescription of three years, provided by Act No. 185 of 1904, pleaded also in support of the same sale; and the prescriptions of 10' and 30 years, by which one may acquire property, pleaded, respectively, under articles 3478 and 3499 of the Civil Code.

[4] With respect to the prescription of three years provided by the article of the Constitution cited, it is clear that it has no application, since the tax sale in support of which the prescription is pleaded does not embrace the property in controversy. Learned counsel, however, cites decisions to show that where a tax sale and an assessment furnish the means of identifying the property, though the sale and the assessment do not identify it, still, as the means are furnished by which the property may be identified, the

prescription of three years is applicable. However, the decisions cited are not pertinent here, for the reason that the property in litigation is not the property sold. Granting, however, that there is error in the description, still no means appear of identifying the property sold as that in contest. Had the tax debtors been the owners of the land in question, it might possibly be identified as that sold, but they owned no part of it at any time.

[5] In so far as concerns the prescription pleaded under Act 185 of 1904, that act, in our view, is applicable only to sales based on a forfeiture, or which convey or purport to convey an interest in or title to property acquired, or pretended to have been acquired, by the state or one of its political subdivisions by such means, whether the property was actually forfeited or not. It does not appear that the sale in this case was based on a forfeiture, actually or supposedly made, but, instead, the land sold was seized, offered for sale at public auction, and adjudicated to Lepine for the taxes due thereon, and the sale, after the expiration of the period for redemption, was confirmed by the auditor of public accounts by the issuance of the deed conveying full title as provided by section 6 of Act No. 47 of 1873, the act under which the sale was made. Therefore, the sale was based merely upon a seizure and not upon a forfeiture. Granting, however, that the prescription under consideration is not inapplicable upon the ground stated, still we are of the opinion that this prescription has no application here, for the reason that the property conveyed by the sale cannot be identified as the property in litigation.

[6] In so far as concerns the plea of prescription of 30 years, the very basis of that prescription is actual possession by the one urging the plea, and, when the person pleading it desires to tack to his possession the possession of those from whom he holds, then the basis is actual possession by him and them for the above period. C. C. art. 3499 et seq. and article 3493. It does not appear in this case that the Gheens Realty Company and those from whom it holds have had actual possession of the property in contest for 30 years. The land was not inclosed until 1906 or 1908. During the period prior to that time, the Gheens Realty Company had no possession of the property, and the only possession that any of those from whom that company claims had of it consisted in permitting their cattle to graze thereon, but the permitting of one's cattle to graze on uninclosed land, to which the cattle of others have access, and upon which they graze, is not the taking of actual possession of property, within the purview of the articles of the Code, governing prescription. Harang v. Golden Ranch Land & Drainage Co., cited supra. Hence the plea of prescription of 30 years has no ground upon which to rest.

[7] The above ruling disposes of all of the pleas of prescription filed, with the exception of that of 10 years. In order to sustain this plea, it must appear, among other conditions, that the one urging it, or that he and those from whom he holds, had possession of the property for a period of 10 years, the possession having begun in good faith, and having been, at least, in its commencement, corporeal; and furthermore, that the possession is held under an act sufficient to transfer the ownership of the land, had the grantor been the owner thereof. C. C. arts. 3479, 3482, 3487. It appears that the Gheens Realty Company, and those from whom it claims to hold, have had corporeal possession of the property in contest since 1906 or 1908, or for more than 10 years prior to the institution of this suit. It is immaterial, in this instance, whether the possession so held began in good faith or not, for the plea of prescription will have to be overruled, because that company, as will appear, does not hold under a title

that transfers the property here in contest. In making the statement that the defendant, the Gheens Realty Company, does not hold under such a title, we have not overlooked the fact that there are three deeds—one by the Golden Ranch Cattle & Sugar Company to J. R. Gheens, another from Gheens to Garrett and Morrill, and the third from Garrett and Morrill to the Golden Ranch Land & Drainage Company, passed within a few days of each other, in 1910, upon which that company relies, that are made to embrace the property in litigation by referring to a plat prepared by Daney and Waddill in 1906. However, on the other hand, the deed, or adjudication to the defendant company, itself, does not embrace the property in contest. In all substantial respects, it follows the description contained in the deeds, constituting the first links in the chain of title relied upon by the defendant company, which description we have held does not embrace the property in litigation, but, instead, other property.

Could we add to the possession of the property enjoyed by the Gheens Realty Company the possession of the respective vendees in the three deeds above mentioned, we then would have the required period of possession, but this we are unable to do, for the reason that the possession of that company was not under a deed or act which transferred to it the property of which it took possession, and which is in contest here. To add these several possessions together would be to permit the defendant company to acquire the property in question by the prescription of 10 years, by a possession which is not under a title purporting on its face to transfer the property, when, as we have seen, the possession must be under such a title or act of conveyance in order to sustain that prescription. Even when there is error in the description of the property, sought to be conveyed, the foregoing principle has been applied, and the

ruling made that until the error has been corrected the prescription of 10 years does not begin to run, for the reason that until then the possession is not under or by virtue of a title. Albert Hanson Lumber Co. v. Angelloz, 118 La. 861, 43 South. 529.

Having found that the pleas of prescription filed by the defendant company are not well founded, that it has no title to the property in controversy, and that plaintiffs have discharged the burden resting upon them of establishing title to the land sued for, the next question that presents itself for determination is that of rents and revenues.

The demand for rents and revenues is made against the Succession of John R. Gheens, Charles W. Gheens, and the Gheens Realty Company, in solido, and covers rentals alleged to be due for a period of 4 years and 10 months, or from June 6, 1914, up to the institution of this suit. In so far as concerns Charles W. Gheens and the Succession of John R. Gheens, it does not appear that either John R. Gheens or Charles W. Gheens, who, it is alleged, had possession of the property for a part of the above period, was in possession of any of it during the 4 years and 10 months mentioned. Hence plaintiffs have established no claim for rent as against Charles W. Gheens or the Succession of John R. Gheens. In so far as relates, however, to the Gheens Realty Company, it appears that it was in actual possession of the property during all of the above period, and during that time was withholding it from plaintiffs. When it took possession, there was a fence along the 80-arpent line, constructed in 1906 or 1908, by one of those from whom the Gheens Realty Company claims title, which in connection with other fences and Bayou Vacherie completes the inclosure of the property.

[8, 9] Since all of the rent claimed by plaintiffs in this case is alleged to be due for occupying the property prior to the institution of this suit, it is incumbent upon plain-

tiffs, in order to recover any part of the rent sued for, to prove that the occupant, the Gheens Realty Company, was a possessor in bad faith, for it is only the possessor in bad faith who is liable for rents and revenues for his occupancy prior to the time that the property is claimed by the owner. C. C. arts. 502, 3453. This burden, we think, the plaintiffs have discharged, for at the time the Gheens Realty Company acquired the title, which it asserts embraces the property in contest, and at the time it took possession, the suit of Harang et al. v. the Golden Ranch Land & Drainage Co. was pending, and the record discloses that the officers of the former company, or at least one of them, its vice president, Charles W. Gheens, who had no interest to conceal the fact from the company, knew of the pendency of the Golden Ranch suit for the recovery of an interest in the property, and possessed sufficient knowledge concerning the title of plaintiffs herein to charge the company with notice, and make it a possessor in bad faith from the beginning. It is true that this knowledge was obtained from a suit, concerning which no notice of lis pendens had been filed or put of record, but that fact does not alter the case, since the question here presented is purely one of good or bad faith, and since one may acquire knowledge from such a suit, sufficient to make him a possessor in bad faith, although he was not a party to the suit, and though no notice of lis pendens was filed or put of record. Act No. 22 of 1904 and article 503 of Civil Code.

Since the Gheens Realty Company was a possessor in bad faith from the beginning of its possession, it is liable for rents and revenues from that time. Beaulieu v. Monin, 50 La. Ann. 732, 23 South. 937. However, as observed, plaintiffs have sued for them only from the beginning of the possession of the Gheens Realty Company up to the institution of this suit, a period of 4 years and 10 months, and it is only for that period that judgment may be rendered.

The next question to be determined is the amount to be allowed. The property, inclosed, consists of low marsh land and 175 acres of high land, the latter made up of ridges in the marsh. The total area inclosed amounts to 2,314 acres. During at least a part of the period mentioned, the Gheens Realty Company leased a few acres of the high land for agricultural purposes, the lease providing that the company should receive a portion of the crop as rent, and there is evidence tending to show that during that period the company did not use the marsh as a pasture, the only use that could be made of it, as the company did not care to permit its cattle to range so far from home.

[10] The court a qua dismissed the demand for rents as in case of nonsuit, and this caused plaintiffs to also become appellants. As plaintiffs have sued for rents and not for the actual fruits produced by the property, in our view, they are entitled to judgment for an amount equal to the fair rental value of the property. Durbridge v. Crowley, 44 La. Ann. 74, 10 South. 402. It is not important in determining the question here presented whether defendant so managed the property as to have derived but little or no revenue from it. The fact remains that during that period plaintiffs were illegally deprived of their property, and should not be permitted to suffer because of the manner in which defendants may have managed or used it, but, under the circumstances, are entitled to its fair rental value. Winter v. Zacharie, 6 Rob. 467. However, in computing the amount that should be allowed, all of the property inclosed should be treated as suitable only for pasturage. The comparatively small area of high land contained in the tract, is, we think, necessary to make the remainder of the property valuable as a pasture. The evidence satisfies us that a fair rental value for the 2,314 acres, inclosed, is 20 cents an acre

a year, which, for a period of 4 years and 10 months, amounts to $2,236.70.

Out of precaution, and as plaintiffs have reserved in their petition the right to sue for rents, accruing after the institution of this suit, we shall reserve them this right. We shall also reserve to the Gheens Realty Company the right to sue for taxes, if any, paid on the property, and likewise for improvements, if any, constructed thereon by it.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be amended by allowing plaintiffs, as against the Gheens Realty Company, said sum of $2,236.70, with 5 per cent. per annum interest thereon from April 8, 1919, until paid, and by reserving such rights, if any, as plaintiffs may have to sue for rent accruing after the institution of this suit, and by reserving to the Gheens Realty Company such rights, if any, that it may have to sue for taxes paid on said property and for such improvements that it may have constructed thereon, and, as thus amended, it is ordered and decreed that said judgment be affirmed. It is further ordered that the Gheens Realty Company pay the costs of this appeal.

Rehearing denied by the WHOLE COURT.